[No. 34835. Department One. September 10, 1959.]

SHOPPING CENTER MANAGEMENT COMPANY, INC., *et al., Respondents,* v. M. F. RUPP *et al., Appellants.*[1]

[1]Reported in 343 P. (2d) 877.

*Melvin T. Swanson,* for appellants.

*Peyser, Cartano, Botzer & Chapman, Stephen C. Watson,* and *John D. Cartano,* for respondents.

DONWORTH, J.—The three plaintiff corporations named in the caption jointly owned a parcel of land situated on highway 99 in southern King county in an area known as Federal Way. In June, 1955, they commenced the construction of a shopping center on this land and entered into a contract with defendant Rupp, who was a plumbing and heating contractor, to install a complete storm drainage system, a large septic tank and drain field on the premises for $25,830. The defendant General Casualty Company of America, as surety, executed a contractor's bond along with defendant Rupp, as principal, insuring the faithful performance of the contract by him.

The issue in this case involves the liability of defendants under a guaranty clause in the contract for the alleged failure of two automatic submersible sewage pumps (described in detail in the contract) to function properly after they were installed in the septic tank. As a part of the work, the contractor agreed to furnish and install these pumps for the purpose of disposing of the effluent from the septic tank by pumping it to the drain field, where it was planned to have it seep into the ground.

The specifications described the pumps as Weil model SE 830 or an approved equal. The contractor ordered the pumps through Seattle Plumbing Supply Company, who ascertained from Weil's manufacturer's representative that model 830 was not available. Thereupon model 860 was substituted. After the contract was executed, the contractor suggested to the architect that the starting devices be installed outside the septic tank because the manufacturer had stated that this should be done, but the proposed change was not permitted (on the theory that it would be impractical to do so), and the equipment was installed according to the plans.

The parties stipulated that the effective date when the guaranty clause in the contract became operative (for one year) was December, 1955. The difficulties encountered in the opereation of the pumps are described below in the trial court's oral opinion.

The case was tried to the court, sitting without a jury, and resulted in a judgment for the plaintiffs (based on findings of fact and conclusions of law) in the sum of $1,445. Of this sum, $945 represented the cost of the pumps, and the balance ($500) was allowed as damages caused plaintiffs. by reason of the failure of the pumps to function properly. The judgment also provided that plaintiffs should permit. defendants to remove the pumps and equipment from the premises within thirty days after satisfaction of the money judgment. Defendants have appealed from this judgment..

The contractor (M. F. Rupp) will be referred to as though he were the sole appellant, and respondents will be desig-- nated as the owner.

At the close of the trial, the court rendered an oral opinion in which it reviewed the evidence (much of which consisted of technical testimony describing the plumbing and electrical devices used for the removal of the effluent from the septic tank).

Since this case involves several issues of fact, and since we cannot find that the evidence preponderates against the trial court's two findings to which appellant assigns error,. we quote the following portions of the oral decision which. sets forth clearly the court's evaluation of the evidence:

"The contract was entered into in June of 1955, and the pumps were evidently placed in operation some time in the fall of that year. The first trouble developed during a freeze around Thanksgiving, at which time it is agreed that Mr. Rupp was summoned and evidently that particular trouble was eliminated after the pipes had thawed out between the —the drains, I should say, between the drain area and the pumps in question. This was followed by other complaints. from the plaintiffs. Finally in the summer of 1956, the pumps were removed and one of the pumps sent to the factory for examination or repair. Mr. Rupp supplied a substitute pump during that period of time. About ninety

days later the pumps were reinstalled and plaintiffs' witnesses tell me that, or I should say before going into that, that during the time the pumps were out in the summer or early fall of 1956, certain of the electrical controls were removed from inside the pit where they were placed according to the specifications and part of them placed in a building. This was done at the suggestion of the Seattle Plumbing, or Merrill Musgrave—their agents or both—who had been summoned by Mr. Rupp in an effort to satisfy the plaintiffs and alleviate the conditions which the plaintiffs had found so unsatisfactory.

"Getting back to the chronological history of the events, after the pumps—after one pump was returned from the factory and they were reinstalled, I gather in late 1956, as I say, plaintiffs' witnesses testified the pumps were then not satisfactory. There was flooding and finally a substitute pump was inserted by the plaintiffs and the pumps in question were removed and stored. This must have been into 1957 before this was done.

"Finally there was a caucus by all concerned on July 2, 1957, at which time the defendant and Mr. Mussen [an engineer employed by Seattle Plumbing Supply Co.] and Mr. Rosen, who were in on this caucus, Mr. Rosen being the agent of Merrill Musgrave [the pump manufacturer's representative], first learned the pumps had been removed. Just who removed the pumps on this second occasion and stored them is something of a mystery and perhaps isn't too important. Since that time the parties have resorted to litigation to settle their troubles.

"Now getting back to the particular complaints of the plaintiffs, I find that the overwhelming evidence is that the operation of this pumping device, and that includes, of course, the electrical equipment, was most unsatisfactory and that is agreed by all. There is a serious dispute as to just what the cause of it was and whether or not, assuming that the cause be as contended for by the defendant, the defendant can escape liability on the guarantee which he has made.

"It might be well at this point to notice the specifications for the pump because this relates particularly to the contention of the defendant that he had fulfilled the contract and his contract of guarantee because he contends the evidence shows that the trouble with this operation has been the electrical equipment, but if we look to the contract which defendant made, and in speaking of defendant I am refer-

ring to Mr. Rupp, speaking of Mr. Rupp and not the bonding company, he contracts to provide 'Two submersible sewage pumps, Weil Model SE-830 or approved equal, install in septic tank pump chamber.' Then it goes on to describe the pump in some detail; goes on to say that it 'be equipped with high and low-level electrodes, capacitor and magnetic started with hand-off-automatic selector switch. Each pump discharge shall have a 3-inch check valve, and shall be connected to a common 4-inch discharge to the distribution box.'

"In reading those specifications I don't think anyone can escape the conclusion it was contemplated that these pumps and the electrical devices which operated them were to operate upon high and low-level float devices which would be activated when the effluent in the pump got too high and to be deactivated at a point where it got to the proper level. I should go on to say the guarantee is as follows:

" 'The contractor shall guarantee the satisfactory operation of all materials and equipment installed under this contract, and shall repair or replace, to the satisfaction of the owner or architect, any defective material, equipment or workmanship which may show itself within one year after the date of final acceptance.'

"It seems to me very clear that these switches and controls were part of the pump. They were supplied by the manufacturer, and there is no suggestion that the failure of the pump or the failure in the operation of the pump is due to faulty wiring for the pumps did operate, and I think if the wiring had been faulty they wouldn't have operated at all.

"Mr. Rupp installed this pump and I am not too clear from the evidence who actually attached the controls inside the pit, but it was done in accordance with the specifications and drawings, and I don't see how it can be said that the faulty operation of this mechanism was other than the responsibility of the defendant unless there is some other reason—unless he is to escape responsibility for some other reason, which I will now notice:

"First, and I think that the thing that has impressed me the most, is the testimony of Mr. Rupp that previous to the completion of the job or even to the installation he made the suggestion or complained to the architect that according to the manufacturer it would be better to place the controls outside the pit. The architect refused to do this, relying upon, I assume,—at least by implication I gather that to be true—the catalog of the manufacturer.

"In the first place, of course, Mr. Rupp at the time he signed the contract it appeared that the controls would be in the pit and his insistence, or his belief they should be put in a small box immediately above the pit, I can't follow that as being a valid reason to escape liability here for it is obvious, or at least it is to me, one of the principal purposes of installing this particular pump was to get the free use of the area above the pit. I don't know if any witness has said that, but I think that is inherent in the whole setup here. There is above the parking area for this shopping or amusement center, whatever it is. I am not convinced that if these controls were placed as Mr. Rupp suggests, that it would solve this problem if I am to accept the testimony of Mr. Mussen and believe him, and I do. I can't do anything more than say just what he has done. He is an engineer, I gather, of some competence, he is the man whose firm had some interest in this matter, for if the defendant is held liable there might be a suit against his firm, so I don't see any reason for him to say anything damaging to the defendant. He tells me he can't isolate this trouble or tell me anything that will solve the problem.

"It seems to me that the plaintiffs have done everything any reasonable person could be expected to do in informing the defendant of the trouble, and that they were quite justified in early 1957 in removing the pumps and giving them up as a bad job. They can't run a place where the public is gathering and have the sewage backing into the place or into public areas, and I think the defendant has done everything he could. He has called in experts and he has called in the parties that supplied this Weil pump to him, and I think he has gotten hold of a 'lemon' here and there is not much that can be done about it. Nobody suggested what it could be; I mean, any engineer, and Mr. Rupp doesn't pretend he is one or that he is a pump expert. So I think he is liable for such damage as was sustained and he is liable under this contract. After reading the case read by counsel of Port of Seattle against somebody, 124 Washington, Page 10, I am quite convinced that the contractor, and he is a prime contractor, a mechanical contractor, that he has guaranteed that this thing will work for a period of a year. He has guaranteed the satisfactory operation of it and it certainly became defective within a year. Although the testimony has covered more than a year. And it certainly shows acts and things done by both the defendant and plaintiffs to try and rectify the situation.

"I have considerable sympathy with the defendant on this

because I think he has done the best he can. He supplied the particular thing that was set out in the specifications of which he was not the author, but as the case states, when a layman or owner contracts with a mechanical contractor and sets out certain specifications and the contractor agrees to supply that and then agrees to guarantee it will work and operate to the satisfaction of the owner for the period of a year, why, the mechanical contractor has simply, as a part of the consideration of getting the job, agreed to do just that, and that is to guarantee that.

"Mr. Rupp I think with admirable candor has answered a lot of questions that were raised here. When he was asked why, if he believed the electrical controls should not be in the pit, that he did not make more of an issue of it he said, 'I had a big contract here and had a lot of work and expended a lot of money, and I simply wanted to get payment and get my money.' This was a rather small item considering the whole contract was in excess of $25,000.00.

"My view from hearing this testimony is that it is not wise at all to install the controls inside this pit. It seems to me quite reasonable to conclude the gases in a sewer of this kind very likely would be damaging, but on the other hand, I can't find that removing them from the pit would remedy the matter. A part of them have been removed and it hasn't worked. I just agree with Mr. Mussen I don't know what is wrong there and I don't think the obligation is on the plaintiffs to prove what is wrong there. All they have to prove is there is something wrong there and it doesn't work. It is simply a matter of contract for which Mr. Rupp has assumed responsibility."

Appellant's last three assignments of error relate to conclusion of law No. 2, the denial of post-trial motions and the entry of the judgment. They may be discussed together since they relate to the same question.

The guaranty clause of the contract, which is the basis for this lawsuit, reads as follows:

" 'The Contractor shall guarantee the satisfactory operation of all materials and equipment installed under this contract, and shall repair or replace, to the satisfaction of the Owner or Architect, any defective material, equipment or workmanship, which may show itself within one year after date of final acceptance.' "

In urging reversal of the trial court's judgment, appellant relies on several decisions of this court, particularly *Huetter v. Warehouse & Realty Co.*, 81 Wash. 331, 142 Pac. 675 (1914), and *Seattle School Dist. v. King Plumbing & Heating Co.*, 147 Wash. 112, 265 Pac. 463 (1928).

In the *Huetter* case, *supra*, it does not appear that there was any express warranty or guaranty whatsoever, and the court held that, under such circumstances, it could not be said that a subcontractor warranted the sufficiency of the plans and specifications prepared by the city of Spokane for the prime contractor. Thus, that case can have no application here.

In *Seattle School Dist. v. King Plumbing & Heating Co.*, *supra*, it was held that the cost of installing a different type of thermostatic control in a school building made necessary because of the inadequacy of the particular control theretofore installed in accordance with the school district's specifications, could not be recovered by the school district from the contractor who had installed the exact type of control specified in his contract. In that case, the contractor undertook to supply and install thermostats of a *design* and *make approved by the school district's engineer*. Thus, the court found that the contractor could not be held liable when the heating equipment thereafter proved to be inadequately designed for the school district's purposes, since the adequacy of the design was solely the responsibility of the school district's engineer and not that of the contractor. The court relied upon cases supporting the rule that, in the absence of an express warranty, a contractor is not liable for the loss or damage resulting from the defective plans and specifications prepared by the other party to the contract. As we shall later show, in the case at bar, we have an express warranty by the contractor, which has been quoted above.

The trial court, in its oral decision, relied upon *Port of Seattle v. Puget Sound Sheet Metal Works*, 124 Wash. 10, 213 Pac. 467 (1923), which it considered to be controlling. The contractor's guaranty in that case read:

" ' . . . We hereby guarantee to keep the roof installed

by us on the freight sheds of the Smith's Cove project of the Port of Seattle in perfect condition for a term of ten years from this date. If this roof should leak within this time, we agree to repair the same without any cost to the Port Commission, the work to be done within twenty-four hours after receiving notice of such leak. Provided, however, that we shall not be held responsible for damage done to the roof by workmen or others over whom we have no control, or by the defects in the building itself or by fire or lightning.' "

In view of the language just quoted, this court held the contract was not only one to apply roofing, but was also to maintain the roof in perfect condition for a period of ten years. In the course of our opinion, we stated:

"Cases arriving at what are apparently contrary results involving the guarantees of contractors, given in conjunction with their contracts to do the work according to plans and specifications, may be found in many of the books. But the apparent conflict, in large measure, disappears when these cases are analyzed, and the basis of their decision seems to be that it is always a question for determination as to what was meant by the guaranty agreement, and that if the proper interpretation of that agreement is that the contractor was undertaking to do more than to merely perform the work and furnish the materials in compliance with the plans and specifications, he is bound by the wider guaranty and must maintain and keep in repair the work, no matter whether the imperfect condition arose from his failure to comply with the plans and specifications, or may have arisen by reason of a defect in the very plan of construction itself, independent of any other cause. . . . "

We think the guaranty clause of the contract involved in this case is as broad as that in the *Port of Seattle* case, *supra*, and that appellant thereby undertook to do more than merely repair or replace any defective material, equipment, or workmanship which might appear within one year after the date of final acceptance. The express wording of the guaranty provision is that the contractor shall guarantee the *satisfactory operation* of all materials and equipment installed *under this contract*. The contract includes the plans and specifications. Therefore, appellant must be deemed to have guaranteed that the materials and

equipment installed by him would operate satisfactorily under the plans and specifications of the owner.

Thus, it is immaterial in this case whether the pumps failed to operate satisfactorily because of the plans and specifications or because of defective materials, equipment, or workmanship. In either event, appellant must be held, under the language of his guaranty, to have assumed the risk of the events which subsequently transpired, as described in the trial court's oral decision and its findings of fact.

Judgment affirmed.

WEAVER, C. J., ROSELLINI, OTT, and HUNTER, JJ., concur.

