[Civ. No. 25485. Second Dist., Div. Three. June 24, 1963.]

THE CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, Plaintiff and Respondent, v. D. C. CAVANAUGH, Defendant, Cross-Complainant and Appellant; PLASTIC PROCESS COMPANY, Cross-defendant and Appellant.

494

Francis H. O'Neill and Richard L. Huxtabee for Defendant, Cross-complainant and Appellant.

Moss, Lyon & Dunn and Henry F. Walker for Cross-defendant and Appellant.

Pray, Price & Williams, Pray, Price, Williams & Deatherage and William C. Price for Plaintiff and Respondent.

FORD, J.—The defendants Cavanaugh and Plastic Process Company have appealed from a judgment[1] in an action arising out of the failure of a radiant heating system which was installed in the plaintiff's church, to function properly. Cavanaugh was the contractor who made the installation.

---

[1] While there were separate judgments with respect to the complaint and cross-complaint, pursuant to the stipulation of the parties and an order of this court based thereon the judgments are deemed to constitute a single judgment from which the present appeals have been taken.

The plastic tubing or pipe which proved to be inefficient for the particular use was manufactured by Plastic Process Company.

The findings of fact of the trial court were in part as follows: 1. On July 9, 1953, the plaintiff and Cavanaugh entered into a written contract for the installation of a radiant heating system "per plans and specifications by William Craig." It was provided therein that Cavanaugh "shall guarantee all materials and workmanship for a period of one year from completion date." 2. The plaintiff performed all of the terms of the contract except the payment of the sum of $1,319.44. 3. Cavanaugh installed the heating system "in good and workmanlike manner and in accordance with the plans and specifications except that it did not and could not be made to pass the pressure tests provided for in the specifications and the system did not and could not be made to maintain any steady pressure for any appreciable length of time and it did not and could not be made to heat the building. That the reason that the system would not pass the pressure test or hold any pressure or heat the building was because the materials used and which had been purchased by the defendant Cavanaugh from the defendant Plastic Process were unsuited for radiant heating when embodied in concrete. The materials, therefore, were defective." 4. The reasonable and actual cost to the plaintiff for the replacement of the defective plastic pipe with copper tubing and for rebuilding the floor was $15,100. If copper tubing had been used initially, the cost would have been $800 more than the amount set forth in the plaintiff's contract with Cavanaugh and, "therefore, plaintiff was damaged by reason of the defective material in the amount of $14,300.00." 5. Cavanaugh represented and warranted to the plaintiff that "the materials to be used in said heating system were capable of and would perform the same functions and with the same efficiency as copper tubing and that they were in all respects sound, adequate and free from defects." 6. The plaintiff was "ignorant of the falsity of such representations and warranties and was unable and did not have access to the truth concerning them and relied on such representations and warranties in permitting the use of plastic tubing in lieu and in place of copper tubing." 7. The plaintiff "did not discover or have any knowledge of the defective condition of said tubing and of the fact that it was inadequate until on or about April 20, 1956." 8. The defendant Plastic Process Company sup-

plied the tubing described as Plastipipe No. 110 which was used by Cavanaugh in installing the heating system. 9. Prior to the execution of the contract between the plaintiff and Cavanaugh and prior to the time when the tubing was sold by Plastic Process Company to Cavanaugh and installed in the plaintiff's building, Plastic Process Company represented to the plaintiff and its agents and to Cavanaugh that the plastic tubing manufactured and supplied by Plastic Process Company could be used in lieu of and in place of copper tubing in a radiant heating system embedded in concrete and would be suitable for the purpose and free from defects. Plastic Process Company "represented and warranted that the plastic tubing would be satisfactory and adequate in every respect for the purpose for which it was intended to be used, namely as tubing embedded in concrete in a radiant heating system." The plaintiff relied upon those representations and was unable to investigate the truth or falsity thereof. 10. In reliance upon the representations and warranties, "the plaintiff through its architect and duly authorized agents, specified plastic tubing and other materials manufactured by" Plastic Process Company and had Cavanaugh "install same in the church as part of the heating system." 11. The warranties and representations made by Plastic Process Company "were made to the public generally and to the trade including architects, engineers and heating contractors with the hope, expectation and intention that members of the trade would specify their use and would relay the warranties and representations made by said defendant to the ultimate consumer such as plaintiff. That in reliance upon these representations and warranties, plaintiff through its architect Thomas and through the engineer Craig employed by its architect who designed and engineered the heating system, relied upon said warranties and representations and did so design the heating system as to call for the use of the products of defendant Plastic Process Co." Those warranties "were made in printed advertising material put out to the trade and the public generally and to the persons in the position of plaintiff." 12. By reason of the specification by the plaintiff "through its architect and engineer, through its heating contractor, D. C. Cavanaugh, plaintiff purchased from defendant Plastic Process Co., the materials which were used in the heating system." 13. The plastic tubing "was defective and unsatisfactory for the purpose for which it was used and for which it had been sold and did not perform as represented and

warranted by defendants, in that among other things, it tended to split or crack by reason of shrinkage when embedded in concrete especially at bends and at points where its fittings would not permit it to move with the concrete"; it was, therefore, "unsatisfactory and unsuitable for the purpose for which it was sold." 14. These defects "were latent and unknown to plaintiff and plaintiff had no way of knowing of them and of the unsuitable and unsatisfactory condition of said plastic tubing when embedded in concrete until on or about April 20, 1956 when it learned that the plastic tubing was not suitable, but that it was not until much later that plaintiff learned the reason for its unsuitability." 15. "[I]mmediately upon discovery of said defect, plaintiff gave timely notice to defendants."

Judgment was rendered in favor of the plaintiff against Cavanaugh for the sum of $12,980.56 and against Plastic Process Company for $14,300.

With respect to the cross-complaint filed by Cavanaugh against Plastic Process Company, the findings of fact were in part as follows: 1. In the contract between Cavanaugh and the plaintiff church, it was provided that the installation of the radiant heating system was to be in accordance with plans and specifications prepared for the plaintiff church by its architect. Those plans and specifications "provided and required that the radiant heating panels so installed be of ½ inch '#110 Plastipipe,' a trade named article manufactured exclusively by Cross-Defendant Plastic Process Company." 2. By the terms of that contract Cavanaugh "agreed and guaranteed that the materials used be of standard grade unless otherwise specified, and that the said materials used would be those specifically required by the specifications of the church." 3. Cavanaugh made the installation "in a good and workmanlike manner." The "material furnished and installed was of standard grade, free from visible defects and in accordance with the specifications." 4. "That from or on [sic] June 1, 1953, at various meetings attended by the Cross-Complainant [Cavanaugh] and one William G. Craig, a Mechanical Engineer, Harold Kotkin, Vice-President of Cross-Defendant Plastic Process Company did represent that extensive tests had been made on plastic tubing, and specifically '# 110 Plastipipe' and that the said product had been found satisfactory and would perform as well as, if not better than, copper tubing, when installed in a radiant heating system embedded in concrete and that it would not deteriorate

and would withstand pressure to the same extent as copper tubing . . . and that as a result of the said extensive tests made on the use of said product for said purpose his company could and would unconditionally warrant and guarantee that the said plastic tubing would perform as satisfactorily in radiant heating system[s] as if copper tubing had been installed therein and would last as long." 5. William G. Craig, a mechanical engineer, was employed by the plaintiff church "to prepare the plans and specifications for a radiant heating system . . . and did therein provide as a direct result of the said statements and representations of the said Harold Kotkin, that the radiant heating panels be installed with use of '# 110 Plastipipe' . . . and the said William G. Craig did in so providing, expressly rely upon the representations and statements made by the said Harold Kotkin aforesaid." 6. Cavanaugh did, at the request of the plaintiff church, "render his bid to install the said radiant heating system in accordance with the specifications including installation of '# 110 Plastipipe.'" Cavanaugh relied upon the representations made to him by Plastic Process Company's agent. 7. Prior to the execution of the contract for installation, the plaintiff church's representative, Bishop Johnson, inquired of Cavanaugh about "the suitability of '# 110 Plastipipe' for use in a radiant heating system"; Cavanaugh informed plaintiff's representative that Kotkin, representing Plastic Process Company, had informed him that extensive tests had been made and that the product was as good as, if not better than, copper tubing. In so doing, Cavanaugh relied upon the statements previously made to him by Kotkin, which statements he believed to be true. 8. The plaintiff church, in executing the contract containing the provision for the use of "# 110 Plastipipe" tubing, relied upon: "(1) The architect's specification of subject product as his first choice; (2) Its design by the manufacturer for such purpose and; (3) The statements aforesaid repeated to Cross-Defendant Church's representative by Cross-Complainant."

The trial court determined that Plastic Process Company "made express and implied warranties" to Cavanaugh that "# 110 Plastipipe" was as good and suitable as copper tubing in radiant heating systems, that such warranties were untrue, and that Cavanaugh repeated the warranties to the plaintiff church in reliance thereon. Judgment on the cross-complaint was rendered in favor of Cavanaugh and against Plastic Process Company for the sum of $14,300.

Consideration will first be given to the problem of whether the evidence was sufficient to support the determination that there was a breach of warranty on the part of the defendant Cavanaugh. It is to be noted that the specifications with respect to the heating system prepared on behalf of the plaintiff church provided in part as follows: ''2. The floor coils shall be plasti pipe #110 and placed in a level position on top of a crushed stone or gravel fill. . . . The concrete floor slab shall be poured directly over the heating pipe in accordance with the drawings. In no instance shall the thickness of the concrete above the top of the piping be less than 1''. . . . 10. This contractor shall guarantee all materials and workmanship for a period of one year. . . . ALTERNATE 1: If copper tubing is used instead of Plastipipe ADD or DEDUCT. . . .''

The plaintiff offered the testimony of William G. Craig as set forth in his deposition. Mr. Craig was a licensed mechanical engineer. At the request of Mr. Thomas, the architect for the plaintiff's building, he prepared the plans and specifications for the radiant heating system. Therein he specified No. 110 Plastipipe. Prior to that time he had discussed with Harold Kotkin the use of plastic pipe for radiant heating purposes. His conversation was generally to the effect that Plastipipe was suitable for radiant heating. At a meeting of the Radiant Heating Institute Mr. Craig heard a representative of Plastic Process Company talk. He further testified as follows: ''Q. And in the course of speaking, represented that this pipe—— A. It was suitable. Q. Plastic pipe was suitable for radiant heating? A. That is right. Q. And then you began to specify plastic pipe? A. That is right.''

Other testimony of Mr. Craig was as follows: ''Q. Now you had had occasion to prepare specifications for radiant heating systems prior to this one in the church, hadn't you? A. Yes, sir. Q. And in which you had specified plastic pipe? A. Yes, sir. In fact, I believe I have about seven or eight stake houses for the Latter-Day Saints; that was prior to this. Q. Well, prior to this time, how many jobs altogether would you say you specified radiant heating for, with plastic pipe? A. I couldn't say—Hundreds. Q. Hundreds? A. Yes, sir. Q. And prior to the time that you prepared the specifications, there had been other complaints where there were leaks, hadn't there? A. No, sir. Q. Complaints where the system had failed because of leaks? A. Not on plastic pipe. Q. Is this the

only job you had ever had where there was a complaint of the plastic pipe leaking on a radiant heating system? A. I believe there was one on Coldwater Canyon on a residence, and that is the only one I recall. Q. And there were none others in any churches? A. No, sir, not to my knowledge. There was Bakersfield, Lompoc, Lakewood, that are about the same size churches as this, and to my knowledge there was some complaint on the Lakewood. The Latter-Day Saints installed that themselves, and they had some trouble with a few joints where they cemented them. Q. Now, the Lakewood Church was put in considerably ahead of the San Pedro church? A. I believe so, yes. Q. And you drew the specifications there? A. Yes, sir. Q. Did you ever go down and inspect that system? A. Yes, sir. Q. And they had the very same trouble with leaks, didn't they? A. No, . . .'' As to what led him to specify plastic tubing, he said: ''Q. Now, you stated that you didn't specify plastic tubing in any of these radiant heating jobs until about two years after it came out. What determined you then to start specifying plastic tubing? A. Well, I met with the Plastic Institute—I forget the name of it—and Yardley and Mills and Plastipipe and Carlon were the big, you might say the big manufacturers of it, and they gave us evidence that it was practical, as anybody does with any equipment. Q. Now, the evidence they gave you was they told you that, wasn't it? A. No, it was all more or less in literature. . . . Q. Well, either their representatives personally or by literature, they put out, they represented that it was suitable? . . . [A.] That is right. Q. But they said it would take the place of copper? A. I would say they convinced us it was suitable for use in radiant heating. Q. Now, was Plastipipe one of the companies involved? A. Yes, they belonged to the association.'' ·

Bishop Burley Johnson, who acted on behalf of the plaintiff church, related his discussions with Mr. Joyce, the agent of the defendant Cavanaugh, prior to the execution of the contract for the installation of the radiant heating system. He showed Mr. Joyce a copy of the specifications. Joyce indicated that he had observed the plans and specifications at the architect's office and, because of that, had come to see Bishop Johnson about submitting a bid. Prior to the signing of the contract, Mr. Joyce showed him some brochures containing pictures of plastic pipe being used in various ways. But he could not say that they were brochures of the Plastic Process Company. Bishop Johnson further testified as follows; ''Q. . . .

Now, can you tell us what, if any,—what the discussion was, if any, between you and Mr. Joyce concerning the alternates there for copper or plastic tubing? A. When Mr. Joyce contacted me in connection with getting us to enter into a contract with the Cavanaugh Plumbing Company to have them put the heating system into the church building that we were building, we went over the specifications primarily. However, I had a set of plans there, too. But the specifications were the things that were discussed most in the preliminary stages of it. One: First on the list here is 'copper,' and, of course, the next is 'plastic pipe,' as number 1 and number 2, alternate methods of putting a heating system in. I asked Mr. Joyce at the time when he recommended the plastic tubing or pipes for the heating coils, I asked about the copper tubing instead. And at that time Mr. Joyce referred to the tests that's [sic] been run on plastic tubing for this type of service, and said that the Du-Pont Company had run tests in their laboratories—and using his words—'the equivalent of a hundred years of service of the plastic tubing; and for all practical purposes the plastic tubing were [was] just as good as copper, if not better, for this heating system.' . . . Q. Did the statements of Mr. Joyce, . . . have any effect or did they take any account [sic] in any way in your decision as to plastic or copper? . . . A. Well, his recommendation of the plastic pipe was the primary thing which caused me to go for it and accept a contract for that kind of a system.'' On cross-examination, Bishop Johnson stated: ''However, from between our meetings, that is, Mr. Joyce and myself, in connection with this thing, I would call and talk this over with Louis Thomas [the architect]. And, of course, Mr. Cavanaugh was in contact with Mr. Thomas's office with the plans and specifications, and no doubt talked these things over with him.'' He further testified as follows: ''Q. Did you talk with Mr. Thomas about using copper instead of Plastipipe? A. Yes, I discussed that with him. Q. Did Mr. Thomas explain why he had specified in the specifications Plastipipe? A. He told me that it had been recommended to him that the plastic was as good if not better than the copper.'' He also discussed with some of the other bidders the subject of pipe or tubing. He did not recall whether Joyce mentioned a particular brand of plastic pipe. He had no personal contact with Mr. Craig prior to the time the contract was signed.

Howard Joyce, who had been the manager of the heating department in the defendant Cavanaugh's company, was called as a witness on behalf of that defendant. He first

learned through the architect, Mr. Thomas, that the plaintiff was going to install a radiant heating system. As to his initial discussion with Bishop Johnson, Mr. Joyce testified as follows: ". . . the general discussion was regarding whether the job would be installed per plans and specifications. That was answered, 'Definitely, yes.' We discussed the material. The Bishop asked me about copper versus plastic. I explained, to the best of my ability, what each would do, what it had done in the past, and price, what was the price difference between copper and plastic. I offered an approximate price. I did not submit a bid because it was not asked for in the specifications."

We turn first to the problem of whether the discussions between Mr. Joyce and Bishop Johnson prior to the execution of the contract gave rise to a warranty. ▮ The agreement was for "Complete Floor Panel Radiant Heating System installation . . . including all labor, materials, inspections and guarantees." It was a contract for labor and material rather than a contract to sell. Consequently, the warranty provisions of the Uniform Sales Act (Civ. Code, §§ 1732-1735) do not govern. (*Aced* v. *Hobbs-Sesack Plumbing Co.,* 55 Cal.2d 573, 580-582 [12 Cal.Rptr. 257, 360 P.2d 897].) ▮ But independently of the provisions of that act, an express or implied warranty could be found to have arisen in such a transaction if the facts reasonably justified such a determination. (See *Aced* v. *Hobbs-Sesack Plumbing Co., supra,* 55 Cal.2d 573, 582.)

While the provisions of the Uniform Sales Act are inapplicable, guidance in the determination of the nature and effect of the statements of Mr. Joyce may be found in authorities dealing with kindred problems in the law of sales. ▮ The essence of a warranty consists of a material promise or a material affirmation from which a contractual or quasi-contractual obligation may be implied. (1 Williston on Sales (rev. ed.) § 181, p. 464.) ▮ "Representations which merely express the seller's opinion, belief, judgment, or estimate do not constitute a warranty." (46 Am.Jur., Sales, § 323.)

▮ In the present case the defendant Cavanaugh was not undertaking the task of designing or making a selection of a heating system suitable for the building. Nor was he attempting to sell, as a dealer, a particular brand of merchandise. Rather, he was pursuing an opportunity to submit a bid in accordance with plans and specifications prepared on behalf of the plaintiff by its architect with the professional assistance of Mr. Craig. The specifications provided for the use of a

particular product, No. 110 Plastipipe, and contained an alternative provision for the use of copper tubing. Obviously, as between the defendant Cavanaugh and the plaintiff, the prime responsibility for the specification of the use of plastic tubing was with the plaintiff's architect and his consultant, Mr. Craig.[2]   With respect to Bishop Johnson's inquiry of Mr. Joyce about the respective merits of plastic and copper tubing, the only reasonable inference to be drawn was that he was seeking merely the opinion of Mr. Joyce who stood ready on behalf of Mr. Cavanaugh to obtain and use whatever materials the plaintiff and its architect required. Under the circumstances Mr. Joyce's language could not reasonably have been understood to constitute a promise or affirmation rather than an expression of an opinion, together with the reasons therefor, with respect to the suitability of the specified pipe. Certainly, the specification of Plastipipe by Mr. Craig did not, in and of itself, give rise to a warranty on Mr. Craig's part in the nature of an absolute guaranty that satisfactory results would ensue. (*Bonadiman-McCain, Inc.* v. *Snow,* 183 Cal.App.2d 58, 70 [6 Cal.Rptr. 52]); Mr. Joyce's position partook more of the nature of that of Mr. Craig in the rendition of services than of the nature of the position of a seller urging the purchase of a particular product regularly sold by such seller. Moreover, there could hardly be a question of superior knowledge on the part of Mr. Joyce since the plaintiff had engaged and relied upon an architect who in turn had relied upon an experienced heating consultant, Mr. Craig. No express warranty of fitness arose.

But even if it be assumed that any oral statement of Mr. Joyce constituted a material promise or a material affirm-

[2]The factual situation in *Aced* v. *Hobbs-Sesack Pumbing Co.*, *supra*, 55 Cal.2d 573, appears to have been different from that in the present case with respect to the specifications for the heating system. While the opinion in the *Aced* case does not reveal the nature thereof, the opening brief of the appellant in that case states as follows: "Hobbs submitted to Aced a written bid whereby Hobbs agreed to 'furnish the necessary labor and materials to do the radiant heating as per plans and specifications prepared . . . for the Robert Poole job' . . . . There were no 'plans' in existence for the radiant heating system. The only specifications concerning the system were on sheet 1 of the floor plan . . . , and they provided:
'Radiant heating to be installed to maintain a 70 degree inside temperature at 30 degrees outside.' "
Thus, in the *Aced* case there does not appear to have been written specifications under which the builder required that the heating contractor use a particular kind of tubing which was designated by its trade name. (Cf. *Bancroft* v. *San Francisco Tool Co.*, 120 Cal. 228, 231 [52 P. 496].)

ation in the nature of an express warranty, under the parol evidence rule such statement cannot be considered as giving rise to an obligation on the part of Cavanaugh. ■ The case in which that substantive rule of law is applicable is succinctly stated in *Pollyanna Homes, Inc.* v. *Berney*, 56 Cal. 2d 676 [16 Cal.Rptr. 345, 365 P.2d 401], at page 679, as follows: "Whether the parol evidence rule applies depends upon whether there was an 'integration' [citation] or 'a complete expression of the agreement of the parties. . . .' [Citations.]"

■ While the parol evidence rule does not preclude proof of contemporaneous oral agreements collateral to, and not inconsistent with, a written contract where that contract is either incomplete or silent on the subject and the circumstances justify an inference that it was not intended to constitute a final and inclusive statement of the transaction, such evidence is not admissible when there is a complete and final written expression of the agreement. (*Mangini* v. *Wolfschmidt, Ltd.*, 165 Cal.App.2d 192, 198 [331 P.2d 728].) ■ As stated in *Pollyanna Homes, Inc.* v. *Berney, supra,* 56 Cal.2d 676, at pages 679-680: "Generally, finality may be determined from the writing itself. If on its face the writing purports to be a complete and final expression of the agreement, parol evidence is excluded. [Citations.]"[3]

■ The written contract between the plaintiff and Cavanaugh in effect incorporated the plans and specifications prepared by Mr. Craig.[4] The only reasonable conclusion to be drawn from an examination of that written contract is that it was a complete and final expression of the agreement of the parties. Therein it was provided as follows: "This contractor shall guarantee all materials and workmanship for a period of one year from completion date." That provision was, except for the words "from completion date," in the identical language contained in the paragraph of the specifications entitled "GUARANTEE." It is true that in the introductory paragraph of the specifications relating to the heating system, which paragraph is entitled "SCOPE OF THE WORK," it is stated in part as follows: "The work to be done by this contractor consists of the complete installation of a radiant

---

[3]In Witkin on California Evidence it is said at page 402: "The California courts usually take the traditional position that finality is determinable from the document itself. If on its face it purports to be a complete expression of the agreement, it is conclusively presumed to contain all of the agreed terms, and extrinsic evidence is excluded."

[4]The contract provides in part: "System to be installed per plans and specifications by William Craig."

heating system within the building, with the furnishing of all labor and material *to provide a complete and satisfactory system."* (Italics added.) But it is not reasonable to conclude that the words herein emphasized were incorporated in the contract as an undertaking in the nature of a warranty on the part of the contractor. Rather, those words indicate, as the heading of the paragraph states, the scope or purpose of the specified undertaking. That conclusion finds support in the isolation of that language from that set forth in the subsequent paragraph entitled "Guarantee."[5]

A similar problem was before the court in *United Iron Works* v. *Outer Harbor etc. Co.*, 168 Cal. 81 [141 P. 917]. Therein it was the contention of the defendant that the plaintiff had made a warranty that it would build and deliver a dredge capable of doing certain work and that the failure of the dredge to operate successfully relieved the defendant from liability for payment. It was the position of the plaintiff that the full measure of its duty was defined by the written contract between the parties and that no warranty of that nature was contained therein. The court held (168 Cal., at pages 84-85) that parol evidence was not admissible for the purpose of showing a warranty as claimed by the defendant. In *Merchants Finance Co.* v. *Acosta Bros.*, 82 Cal.App. 431 [255 P. 772], it was said at page 433: "And, of course, in so far as an express oral warranty that the tractor was fit for the purpose of pulling a six-foot double disk is concerned, such testimony would be inadmissible on the ground that the contract was thereafter reduced to writing, and all oral negotiations were merged in the written contract." (See also *El Zarape etc. Factory, Inc.* v. *Plant Food Corp.*, 90 Cal.App.2d 336, 344 [203 P.2d 13]; 43 Cal.Jur.2d, Sales, § 101.)

In the light of the applicable law, there is no sound basis in the record for the finding of fact that Cavanaugh represented and warranted to the plaintiff that "the materials to be used in said heating system were capable of and would perform the same functions and with the same efficiency as copper tubing and that they were in all respects sound, adequate and free from defects." Cavanaugh used the very ma-

---

[5]Compare that language with the contractual provision involved in *Shopping Center Management Co.* v. *Rupp*, 54 Wn.2d 624 [343 P.2d 877, 881], which was as follows: "The Contractor shall guarantee the satisfactory operation of all materials and equipment installed under this contract, and shall repair or replace, to the satisfaction of the Owner or Architect, any defective material, equipment or workmanship, which may show itself within one year after date of final acceptance."

terials which he was required to use under the terms of the contract. By the language of the written contract Cavanaugh did not warrant that the specified product, No. 110 Plasti-pipe, would work efficiently under the design which was furnished by the plaintiff's architect and to which Cavanaugh's work had to conform. There was no sound basis for the imposition of liability upon him on the theory of breach of an express warranty as to the adequacy of the plastic pipe or tubing for the designated use. (See *Seattle School Dist.* v. *King Plumbing & Heating Co.*, 147 Wash. 112 [265 P. 463, 465]; *Shopping Center Management Co.* v. *Rupp*, 54 Wn.2d 624 [343 P.2d 877, 882].)

It is true that the trial court found upon substantial evidence that the heating system "did not and could not be made to pass the pressure tests provided for in the specifications and the system did not and could not be made to maintain any steady pressure for any appreciable length of time. . . ." But the trial court also determined that the reason for such failure was that, although Cavanaugh had installed the heating system "in good and workmanlike manner," the "materials used and which had been purchased by the defendant Cavanaugh from the defendant Plastic Process were unsuited for radiant heating when embedden in concrete." No charge of fraud or bad faith on the part of Cavanaugh was made. It is clear from the evidence that even if Cavanaugh had been able to cause the system to meet the requirements as to pressure for a period of time, early failure of the system was inevitable. Consequently, the damages suffered by the plaintiff were directly caused by the unsuitability of the product for use in a heating system of the kind herein involved rather than by the nature of the defendant Cavanaugh's performance of his contract.

There is no basis for an implied warranty of fitness of the installation since the work was done in accordance with the plans and specifications supplied by the owner. The applicable law is set forth in *Stevens* v. *Parkford*, 48 Cal.App. 131 [191 P. 699], wherein the court said at page 133: "The contract for the refrigerating plant contained full and complete specifications therefor, and not a scintilla of evidence, insofar as we are advised, was offered tending to show that, as installed, it was not constructed in strict accordance with the specifications therefor. In other words, as to the refrigerating plant, defendants got precisely what they contracted for, and there was no implied warranty that the machine would an-

swer the particular purpose for which the buyers intended to use it. [Citations.]'' (See also *Mannix* v. *Tryon,* 152 Cal. 31, 39-41 [91 P. 983]; *Bancroft* v. *San Francisco Tool Co.,* 120 Cal. 228, 231-234 [52 P. 496]; *Adams-Campbell Co.* v. *Jones,* 71 Cal.App. 723, 729-730 [236 P. 322]; cf. *Seattle School Dist.* v. *King Plumbing & Heating Co., supra,* 147 Wash. 112 [265 P. 463, 465].) The same reasoning has been applied in cases concerned with section 15 of the Uniform Sales Act (Civ. Code, § 1735). (*Morse Boulger Destructor Co* v. *City of Saginaw* (6th Cir. 1959) 264 F.2d 847, 849; *Beaman* v. *Testori,* 323 Mich. 194 [35 N.W.2d 155, 157].)

Since the record does not sustain any recovery by the plaintiff as against the defendant Cavanaugh, Cavanaugh has no liability which can be the basis of any recovery by him under his cross-complaint as against the Plastic Process Company. (Cf. *Riesen* v. *Leeder,* 193 Cal.App.2d 580 [14 Cal.Rptr. 469].) Moreover, in any event Cavanaugh could not recover from Plastic Process Company for breach of warranty because he gave no notice of any breach as required by law. (*Vogel* v. *Thrifty Drug Co.,* 43 Cal.2d 184, 188 [272 P.2d 1]; *Riesen* v. *Leeder, supra,* 193 Cal.App.2d 580, 583; *Burkett* v. *Dental Perfection Co.,* 140 Cal.App.2d 106, 110 [294 P.2d 992].)

We now turn to the question of whether the trial court properly determined that the plaintiff was entitled to recover from the defendant Plastic Process Company. In the resolution of that question the testimony of Mr. Kotkin is pertinent. He was a sales engineer for Plastic Process Company, which was a member of the Radiant Heating Institute in Los Angeles. In 1953 and 1954 he attended the meetings of that organization, his attendance being ''fairly consistent.'' He was interested in promoting the sale of polyethylene pipe or tubing. Part of his testimony was as follows: ''Q. On at least one or more of those Radiant Heating Institute meetings you talked about the use of plastic pipe or polyethylene pipe or tubing for radiant heating installation? THE WITNESS: How do you mean? To individuals or before the group or what? MR. PRICE [counsel for the plaintiff]: Both ways. A. Yes, both ways. Q. Then, on various occasions you talked to individuals in which you discussed and recommended the use of polyethylene tubing for radiant heating? A. Yes. Q. In those discussions, both individually and when you spoke before the group, you recommended the use of polyethylene pipe or tubing as being suitable for such use, that is, in radi-

ant heating? A. That was the subject of the talks: that it was suitable for radiant heating. Q. By that you meant, to be imbedded in concrete? A. That's correct. Q. On those occasions you represented that it could be used in place of copper tubing? A. I said it was suitable and could be used. Q. And should last as long as copper tubing? A. When handled properly, yes. Q. And that it wouldn't rust, rot or corrode? A. That's correct. Q. Now, then, during 1953 you sold this polyethylene pipe or tubing for that purpose? A. That's correct.''

Mr. Kotkin met Mr. Craig during that period of time and knew that Craig was then the secretary of the Radiant Heating Institute. He met Mr. Cavanaugh at the meetings and had occasion to discuss with both Mr. Craig and Mr. Cavanaugh the matters related hereinabove. Mr. Craig and Mr. Cavanaugh were at meetings when he ''talked about plastic pipe in general and, also, suitability of polyethylene for radiant heating.'' Mr. Kotkin testified that Mr. Craig was a ''leading proponent'' and ''was enthusiastic about using polyethylene.'' Kotkin also testified in part as follows: ''Q. In particular, you discussed with them and stated to them in the discussions that polyethylene tubing was suitable for use in radiant heating systems when imbedded in concrete? A. That's right.''

Another portion of Mr. Kotkin's testimony was: ''Q. Now, going back to 1953 when you were permitting the use of polyethylene tubing, did you put out some literature, brochures, and so on? A. There were some brochures or literature put out, yes. Q. Those actually showed photographs of installation of polyethylene tubing imbedded in concrete? A. As I remember, the ones that we had, I don't think it showed it imbedded. I think there was a picture of a radiant heating system being laid out. We don't have any left; I looked for them. Q. Laid out, ready for the concrete to be poured? A. Yes. . . . Q. Now, at all times during those discussions that occurred in 1953, you knew in radiant heating systems the tubing would be imbedded in the concrete? THE WITNESS: In radiant heating systems? MR. PRICE: Yes. A. Yes, in the ones that they used the floor heating panels, yes.''

At a later time in the trial Mr. Kotkin testified as follows: ''Q. (By Mr. Quimby [counsel for defendant Plastic Process Company]): Mr. Kotkin, you were aware, were you not, in 1953 some of the polyethylene pipe which you manufactured was being used for radiant heating systems and was being imbedded in cement? A. Yes. Q. Did your company at that

time recommend or represent that under the company's specifications for that pipe it could be used for that purpose? A. Yes." He attended the meetings of the Radiant Heating Institute as a representative of his company. The meetings were held monthly. On one occasion he was "the featured speaker." The subject matter of his talk was the "suitability of polyethylene or plastic pipe, No. 110, for use in radiant heating, the methods that we recommend to install it, the advantages and disadvantages of the use of plastic pipe." The occasion could have been in 1953 or 1954. Representatives of copper pipe companies also occasionally addressed the members of the institute and discussed the use of copper pipe in radiant heating systems.

Further testimony of Mr. Kotkin while under examination by counsel for Plastic Process Company was: "Q. Now, in 1953 did your company specifically put out any literature or brochures of any kind concerning the use of any of its products in radiant heating systems to be imbedded in cement? A. Specific document, no. But we did have a brochure showing a radiant heating system going in, a picture of one as part of a brochure. Q. Were those brochures or other literature circulated to the general public or to some more restricted audience? A. No, to the plumbing wholesaler, plumbing jobber and the heating men. . . . In the trade. This is trade literature." Under further examination by counsel for the plaintiff, Mr. Kotkin testified as follows: "Q. Now, you say that you had put out some brochures which pictured radiant heating systems going in with polyethylene tubing. You had taken those to some of these Radiant Heating Institute meetings, had you not? A. I believe I had, yes." No other company manufactured a product called "Plastipipe 110."

Mr. Cavanaugh's testimony as to what occurred at the meetings of the Radiant Heating Institute is pertinent. He was a member and attended meetings which were held once a month. He saw Mr. Kotkin there and heard him discuss the use of plastic tubing in radiant heating systems in which the tubing was to be embedded in concrete.

Mr. Cavanaugh had seen brochures and pamphlets. With respect thereto, he testified as follows: "Q. That was representing to the effect—advertising the plastic tubing as being suitable as copper tubing for radiant heating systems? A. I don't know whether in the pamphlet it said that, but they showed radiant heating installations in photograph form, different applications in radiant heating, advised [as] to the

suitability of it. I don't know whether they ever said in their pamphlets it was as good as copper; that I can't say."

The testimony of Mr. Craig, given by means of his deposition, was in part as follows: "Q. Now, you stated that you didn't specify plastic tubing in any of these radiant heating jobs until about two years after it came out. What determined you then to start specifying plastic tubing? A. Well, I met with the Plastic Institute—I forget the name of it—and Yardley and Mills and Plastipipe and Carlon were the big, you might say the big manufacturers of it, and they gave us evidence that it was practical, as anybody does with any equipment. Q. Now, the evidence they gave you was they told you that, wasn't it? A. No, it was all more or less in literature. . . . Q. Well, either their representatives personally or by literature, they put out, they represented that it was suitable? . . . A. That is right. . . . Q. Now, was Plastipipe one of the companies involved? A. Yes, they belonged to the association." With respect to the meetings of the Radiant Heating Institute, Mr. Craig's testimony was in part as follows: "Q. And among the people that came was Harold Kotkin, wasn't it? A. Yes, he was at meetings. I don't particularly remember any of his definite talks, because they had this other young representative that handled all the sales in the field, and I think he did more of the talking. . . . Q. And in the course of speaking, represented that this pipe— A. It was suitable. Q. Plastic pipe was suitable for radiant heating? A. That is right. Q. And then you began to specify plastic pipe? A. That is right."

No particular words are necessary to create a warranty. Any affirmation of fact or any promise relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the person to whom it is addressed to act in reliance thereon and that person does so act. (See *El Zarape etc. Factory, Inc.* v. *Plant Food Corp., supra,* 90 Cal.App.2d 336, 345; *Hayman* v. *Shoemake,* 203 Cal.App.2d 140, 153 [21 Cal.Rptr. 519].) In the present case the evidence was such that the trier of fact could draw the inference that the defendant Plastic Process Company represented that its product was suitable for use in a radiant heating system wherein the plastic pipe or tubing was embedded in concrete and that it would serve the same purpose as copper. In addition to the evidence of oral representations, there was the testimony of Mr. Kotkin that his employer issued a brochure which contained a picture illustrating

such use of the product involved in this case. It was a reasonable inference that the picture constituted a representation that the plastic pipe or tubing was suitable for that use. That illustration was as effective in conveying the information intended to be disseminated as a statement in words would have been. Consequently, the trial court had a substantial basis upon which to determine that it gave rise to an express warranty. (See *Greenman* v. *Yuba Power Products, Inc.*, 59 Cal. 2d 57, 60 [27 Cal.Rptr. 697, 377 P.2d 897]; *Young* v. *Aeroil Products Co.* (9th Cir. 1957) 248 F.2d 185, 189-190; *Freeman* v. *Navarre*, 47 Wn.2d 760 [289 P.2d 1015, 1016]; 46 Am.Jur., Sales, § 314.)

The difficult problem is whether the express warranty inured to the benefit of the plaintiff, the party owning the building in which the product was ultimately used in accordance with the representations of the manufacturer. Traditionally the existence of privity has been considered to be essential to a right of recovery by a person in the position of the plaintiff herein. But, borrowing the apt language of the court in *United States Pipe & Foundry Co.* v. *City of Waco*, 130 Tex. 126 [108 S.W.2d 432, at page 435], it is "the tendency of modern courts [to move] away from the narrow legalistic view of the necessity of formal immediate privity of contract in order to sue for breach of an express or implied warranty." (See also Jaeger, *Privity of Warranty: Has the Tocsin Sounded?* (1963) 1 Duquesne L.R. 1.) A realistic view must be taken of the purpose of the defendant manufacturer in making its representations to persons engaged in designing and installing radiant heating systems of the nature of that with which this case is concerned. That purpose was to influence persons in the position of Mr. Craig to specify the use of the product in the course of the design of such systems and to cause persons in the position of Mr. Cavanaugh to be ready and willing to undertake such installations. The person whose ultimate action was sought to be induced was the one for whom the construction would be done. In this case that person was the plaintiff. ▉ As stated in *Odell* v. *Frueh*, 146 Cal.App.2d 504 [304 P.2d 45, 76 A.L.R.2d 345], at page 508: "The law has always recognized that communication by indirection may be just as effective as when direct. For example, a fraudulent misrepresentation is no less actionable because made to a third person who is intended to and does relay the information to the person who relies." ▉ The defendant Plastic Process Company by means of its repre-

sentations hit the ultimate target at which it had aimed. That being the case, the concept of privity should not be so narrowly construed that that defendant is thereby insulated from responsibility for damage caused to the plaintiff by the inaccuracy of any representation made by it which was in the nature of a warranty. (See *Hayman* v. *Shoemake, supra,* 203 Cal.App.2d 140, 153-157; Ruud, *Manufacturers' Liability for Representations Made by Their Sales Engineers to Subpurchasers,* 8 U.C.L.A.L. Rev. 251; cf. *Odell* v. *Frueh, supra,* 146 Cal.App.2d 504; *Freeman* v. *Navarre, supra,* 47 Wn.2d 760 [289 P.2d 1015] ; *United States Pipe & Foundry Co.* v. *City of Waco, supra,* 130 Tex. 126 [108 S.W.2d 432].)

The defendant manufacturer contends that, in any event, the plaintiff cannot recover for breach of warranty because timely notice of such breach was not given.[6] But the express warranty herein involved was not part of a contract of sale between the manufacturer and the plaintiff. The actual sale was by Plastic Process Company to Cavanaugh. ■■■ Apropos is the statement of the Supreme Court in *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, at pages 60-61: "Like other provisions of the Uniform Sales Act (Civ. Code, §§ 1721-1800), section 1769 deals with the rights of the parties to a contract of sale or a sale. It does not provide that notice must be given of the breach of a warranty that arises independently of a contract of sale between the parties. Such warranties are not imposed by the sales act, but are the product of common-law decisions that have recognized them in a variety of situations. [Citations.] It is true that in many of these situations the court has invoked the sales act definitions of warranties (Civ. Code, §§ 1732, 1735) in defining the defendant's liability, but it has done so, not because the statute so required, but because they provided appropriate standards for the court to adopt under the circumstances presented. . . . ■■■ The notice requirement of section 1769, however, is not an appropriate one for the court to adopt in actions by injured consumers against manufacturers with whom they have not dealt. [Citations.]"

Although the *Greenman* case involved personal injuries,

---

[6]In essence, the trial court found that the plaintiff was aware of the breach of warranty on or about April 20, 1956. On March 21, 1957, eleven months later, the plaintiff's attorney sent a letter to the defendant manufacturer which was in part as follows: "This is to make claim against you for the sum of $14,602.75 for damage suffered by the [plaintiff] . . . by reason of the failure of the plastic pipe, which you delivered to D. C. Cavanaugh for installation in the radiant heating system in the floor thereof."

there is no sound reason for making that fact a basis for distinction with respect to the requirement of notice. In the present case the plaintiff did not deal directly with the manufacturer. A person in the position of the plaintiff ordinarily would not be aware of his rights as against the manufacturer until he had received legal advice predicated upon an adequate investigation of the facts as to the manufacturer's participation in the chain of events culminating in damage to the plaintiff. The reasoning of the *Greenman* case is persuasive with respect to a case of the nature of the one now before the court. ▮ In the absence of a statutory provision for notice, even if the plaintiff did not give timely notice of breach of warranty to the manufacturer the cause of action should not be held to have been barred.

In its answer to the amended complaint the defendant Plastic Process Company pleaded affirmatively that the plaintiff's cause of action for breach of warranty was barred by the two-year statute of limitations. (Code Civ. Proc., § 339, subd. 1.)[7] The action was commenced on April 28, 1958. ▮ The trial court found that the plaintiff learned on or about April 20, 1956, that the plastic tubing was not suitable for the particular use. A cause of action on the warranty herein involved did not arise prior to the latter date. (*Aced* v. *Hobbs-Sesack Plumbing Co., supra,* 55 Cal.2d 573, 583-584; *Southern Cal. Enterprises* v. *Walter & Co.,* 78 Cal.App.2d 750, 754-755 [178 P.2d 785].) The defense of the defendant Plastic Process Company was based on the assumption that the plaintiff's cause of action was not founded upon an instrument in writing.

▮ In the consideration of the question of whether the trial court erred in determining that the plaintiff's cause of action for breach of warranty was not barred by the statute of limitations, it is to be noted that the evidence showed that the manufacturer issued a brochure embodying a picture which was in the nature of a representation as to the use for which the plastic pipe or tubing was suitable. As has been held hereinabove, that representation constituted a warranty. The inference that that warranty was an inducement which led to the specification and purchase of Plastic Process Company's product for use in the plaintiff's building was amply supported by the evidence. It was not necessary that that

---

[7]That statutory provision relates to ''An action upon a contract, obligation or liability not founded upon an instrument of writing.''

warranty be the sole inducement. (See 1 Williston on Sales (rev. ed.) § 206, p. 534.)

Although *Amen* v. *Merced County Title Co.*, 58 Cal.2d 528 [25 Cal.Rptr. 65, 375 P.2d 33], does not involve the problem now before this court, it furnishes some guidance as to a sound approach to the solution of that problem. Therein it was stated (58 Cal.2d, at p. 532): "The contract may be 'in writing' for purposes of the statute of limitations even though it was accepted orally or by an act other than signing. [Citations.] An action is on a written contract even though it is based on a promise implied from the writing." In *O'Brien* v. *King*, 174 Cal. 769 [164 P. 631], at page 772, Justice Sloss stated: "A cause of action is 'founded upon an instrument of writing' when the contract, obligation, or liability grows 'out of written instruments not remotely or ultimately, but immediately.' " (See also *Ravel* v. *Hubbard*, 112 Cal.App.2d 255, 258-259 [246 P.2d 88]; *Tagus Ranch Co.* v. *Hughes*, 64 Cal.App.2d 128, 129-130 [148 P.2d 79]; *Heslin* v. *Lapham*, 77 Cal. App. 137, 139-140 [246 P. 150].) In the present case there was substantial support for a determination that, since the doctrine of privity offered no bar, the plaintiff had established a cause of action based on representations embodied in the brochure issued by the defendant manufacturer which induced the action that resulted in damage to the plaintiff. Consequently, that cause of action was not barred by the two-year statute of limitations upon which the reliance of that defendant was placed since it was founded upon an instrument in writing.

That portion of the judgment which is in favor of the plaintiff as against the defendant Plastic Process Company is affirmed; that portion of the judgment which is in favor of the plaintiff as against the defendant Cavanaugh is reversed. With respect to the cross-complaint, the judgment is reversed both as to the portion thereof in favor of the cross-complainant Cavanaugh as against the cross-defendant Plastic Process Company and as to the portion thereof in favor of the cross-defendant corporation sole as against the cross-complainant Cavanaugh.

Shinn, P. J. and Files, J. concurred.

A petition for a rehearing was denied July 17, 1963, and the petitions of the plaintiff and respondent and the cross-defendant and appellant for a hearing by the Supreme Court were denied August 20, 1963.