[Civ. No. 10661.   Third Dist.   Feb. 5, 1964.]

ANNA E. WILKINSON et al., Plaintiffs and Appellants, v. SOUTHERN PACIFIC COMPANY et al., Defendants and Respondents.

Daniel S. Carlton for Plaintiffs and Appellants.

Newton, Braun & Goodrich and William J. Braun for Defendants and Respondents.

FRIEDMAN, J.—This wrongful death action resulted from a railroad crossing collision between a truck driven by

plaintiffs' decedent and defendant's passenger train. A jury trial culminated in a defense verdict, following which plaintiffs moved for a new trial. The new trial motion was denied. Plaintiffs appeal from the judgment.

One of the factual issues was whether the train crew had complied with their statutory duty to sound the engine bell and whistle as the train approached the crossing. In the course of its instructions, the court read to the jury an excerpt from Public Utilities Code section 7604, which we have quoted below.[1] The court then, at defendants' request, gave the jury Instruction No. 38 (BAJI 149 (revised), Cal. Jury Instructions Civil) as follows:

"If a party to this action violated the statute just read to you, a presumption arises that it was negligent. This presumption is not conclusive. It may be overcome by other evidence showing that under all the circumstances surrounding the event, the conduct in question was excusable or justifiable.

"To prove that a violation of a statue such as that charged in this case was excusable or justifiable so as to overcome the presumption of negligence, the evidence must support a finding that the person who violated the statute did what might reasonably be expected of a person of ordinary prudence who desired to comply with the law, acting under similar circumstances."

In moving for a new trial, counsel for plaintiffs attacked Instruction No. 38, pointing out there was no evidence to warrant that part of the instruction dealing with excuse or justification for violation of statutory duty, hence the instruction was misleading and prejudicial. The trial court agreed that the instruction was erroneous, not being warranted by evidence; since, however, the jury had twice requested a repetition of contributory negligence instructions, the court expressed the view that the jury had probably decided the case upon the contributory negligence issue, thus the erroneous instruction was not prejudicial. We agree that

---

[1]Public Utilities Code section 7604 provides in part:

"A bell, of at least 20 pounds weight, shall be placed on each locomotive engine, and shall be rung at a distance of at least 80 rods from the place where the railroad crosses any street, road, or highway, and be kept ringing until it has crossed the street, road, or highway; or a steam whistle, air siren, or an air whistle shall be attached, and be sounded, except in cities, at the like distance, and be kept sounding at intervals until it has crossed the street, road, or highway; ...."

Instruction No. 38 was erroneous, because there was no evidence in the record to support it. (*Davenport* v. *Stratton*, 24 Cal.2d 232, 254 [149 P.2d 4]; *Elm* v. *McKee*, 139 Cal.App.2d 353, 359 [293 P.2d 827 ].) Indeed, defendant makes little attempt to justify the instruction. The problem is to assess its prejudicial impact on the outcome of the trial.

Plaintiffs contend that in denying a new trial, the trial judge erred in speculating as to the basis for the jury verdict; that Instruction No. 38 was prejudicial as a matter of law; that in any event the instruction was prejudicial in the light of the record. Plaintiffs cite *Elm* v. *McKee, supra,* 139 Cal.App.2d 353, in support of the argument that the erroneous instruction requires reversal as a matter of law. The *Elm* case states: "Even though an instruction is proper in form, if it finds no support in the evidence, it is prejudicial error to give it if it is calculated to mislead the jury. ... Since there is no evidence in the record to establish justification or excuse, the instruction on this subject was misleading and prejudicial." (139 Cal.App.2d at pp. 359, 360.)

█ Certain fundamental errors, such as denial of due process of law, are held to require reversal under all circumstances. (See 3 Witkin, Cal. Procedure, Appeal, § 112, pp. 2285-2286.) With this one important exception, California concepts reject the notion of error which is prejudicial "as a matter of law." Article VI, section 4½, of the state Constitution prohibits the reversal of judgments unless after an examination of the entire record, the reviewing court concludes that "the error complained of has resulted in a miscarriage of justice." Neither *Elm* v. *McKee* nor *Davenport* v. *Stratton, supra,* which is its point of origin, sanctions departure from the constitutional mandate. █ An erroneous instruction, no matter how egregious, justifies a reversal only if it caused a miscarriage of justice. It caused a miscarriage of justice only if, after examining the entire cause, the reviewing court finds a reasonable probability that a result more favorable to the appellant would have been reached had the error not occurred. (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].) A correct application of the rule is stated in *Trelut* v. *Kazarian*, 110 Cal.App.2d 506, 512 [243 P.2d 104]: "An instruction, erroneous or correct, which relates to matters as to which there is no evidence will not justify a reversal unless it has misled the jury to the prejudice of the appellant."

Defendants urge that in passing on the new trial motion, the trial court had discretion to determine the prejudicial

effect of the questioned instruction; consequently that plaintiffs must show an abuse of discretion in order to prevail on appeal, citing *Yarrow* v. *State of California*, 53 Cal.2d 427, 434 [2 Cal.Rptr. 137, 348 P.2d 687]. We do not agree.

This is an appeal from an adverse judgment, not from an order granting a new trial. ■ On appeal from the judgment, the appellate court's duty is to review all rulings and proceedings which involve the merits or affect the judgment or which substantially affect rights of a party. (Code Civ. Proc., § 956.) An appeal from the judgment includes review of an order denying new trial. (*Hamasaki* v. *Flotho*, 39 Cal.2d 602, 608 [248 P.2d 910]; *Citti* v. *Bava*, 204 Cal. 136, 140 [226 P. 954].) ■ Article VI, section 4½, imposes on the appellate court a direct obligation to review the entire record, including the evidence, to determine independently whether error has prejudiced the appellant. (*Tupman* v. *Haberkern*, 208 Cal. 256, 263 [280 P. 970]; 4 Cal.Jur.2d Appeal and Error, § 618.) If, on appeal from the judgment, the appellate court gives weight to a lower court order denying a new trial, interfering only for an abuse of discretion, then the appellate court abdicates—or at least seriously dilutes—its constitutional obligation.

■ True, many California cases state that in ruling on a new trial motion, the trial court exercises its discretion in weighing the prejudicial effect of an erroneous instruction, and its action will be disturbed only for abuse of discretion. (*Parker* v. *Womack*, 37 Cal.2d 116, 123 [230 P.2d 823]; *Mazzotta* v. *Los Angeles Ry. Corp.*. 25 Cal.2d 165, 169 [153 P.2d 338]; *Middleton* v. *California St. Cable Ry. Co.*, 73 Cal.App. 2d 641, 646-647 [167 P.2d 239].) Such statements are appropriate only on appeal from an order granting a new trial. (*Yarrow* v. *State of California, supra*; *Brandelius* v. *City & County of San Francisco*, 47 Cal.2d 729, 744 [306 P.2d 432]; *Richardson* v. *Ham*, 44 Cal.2d 772, 775 [285 P.2d 269].) A statement of that sort is not appropriate where the trial court has denied a motion for new trial and the ground of appeal from the judgment is an error of law, such as an erroneous instruction. In the latter case, the appellate court cannot abdicate its obligation to make an independent appraisal of prejudice.

Dicta in *Finney* v. *Neuman*, 186 Cal.App.2d 463, 467 [9 Cal.Rptr. 331], and *Trelut* v. *Kazarian, supra*, 110 Cal. App.2d at page 514, state that in passing upon the prejudicial effect of an erroneous instruction, the appellate court

will not interfere with an order denying a new trial except for abuse of discretion. Although a Supreme Court hearing was denied in the *Finney* case, we respectfully dissent from such pronouncements when made in the context of an appeal from the judgment after denial of a motion for new trial. Such pronouncements insert the trial court's discretion as a barrier between the appellate court and the latter's duty under article VI, section 4½. They result from a mechanical transposition of a rule from one kind of an appeal to another where it has no pertinence. As a caption in Mr. B. E. Witkin's work on California procedure succinctly observes: *"Reversible Error Is a Relative Term."* (3 Witkin, Cal. Procedure, Appeal, § 100, p. 2269.)

We have conducted an "examination of the entire cause, including the evidence" to determine whether the erroneous instruction was prejudicial. Our province is not to act as a substitute jury, not to determine liability as an original matter. (*People* v. *Dail*, 22 Cal.2d 642, 659 [140 P.2d 828].) Rather our task is to decide whether, absent the error, there is a reasonable probability that the jury which decided the case would have returned a plaintiffs' verdict. (*See People* v. *Watson, supra,* 46 Cal.2d at p. 836; *Murphy* v. *Atchison, T. & S. F. Ry.,* 162 Cal.App.2d 818, 823 [329 P.2d 75].) In doing so, we give no weight to the trial court's denial of a new trial. Thus it is unnecessary to pass upon plaintiffs' argument that the lower court erred in speculating as to the basis for the jury's verdict.

The collision occurred on the Southern Pacific's main northbound line, a short distance north of Cottonwood in Shasta County. In that area, a north-south road called Balls Ferry Road ran parallel to and about 60 feet west of the railroad tracks. The 60-foot longitudinal area between the westerly track and Balls Ferry Road was unoccupied except by power poles, weeds, some shrubbery and trees. A side road, Black Lane, branched somewhat diagonally from Balls Ferry Road to the east and across the railroad tracks. There was a double set of rails at that point, the westerly pair (toward Balls Ferry Road) being the main line. Black Lane was paved. Of the 60-foot approach from Balls Ferry Road to the tracks, the first 25 feet were fairly level, the next 20-foot segment ascended at an 8 per cent grade, and the last 15 feet were fairly level. At the crossing the space between the tracks was paved. The top of the rails extended slightly above the top of the pavement. A 1939 order of the Railroad Commission (now Public Utilities Commission) applicable to

this particular crossing had specified rail tops flush with the roadway, while approach grades were not to exceed 6 per cent.

At the south side of Black Lane, approximately 12 feet west of the westernmost rail, was a wood, white-painted, cross-arm railroad crossing sign. There were no automatic bells, lights or signals to warn of approaching trains.

The time was shortly after noon on a clear day. Decedent was driving a heavy-duty dump truck and trailer northward on Balls Ferry Road. Somewhat behind him, the Shasta Daylight train was traveling northward at a speed of 78 miles per hour. The train was 38 minutes late. According to railroad regulations, the maximum speed limit in that area was 79 miles per hour. Anderson, the fireman on the Shasta Daylight, testified that he first sighted decedent's truck just before it commenced a right turn into Black Lane. He estimated the truck's speed at 10 to 15 miles per hour. He estimated that the train was 400 feet south of the crossing at that juncture. He saw the truck turn to the right and proceed toward the tracks without stopping. When he realized that the truck was not going to stop at the crossing sign, he yelled. When the truck entered the track area the railroad engine was 100 to 125 feet distant from it. Anderson saw the truck stop on the tracks and the driver attempt to jump from it. Although the engineer applied the emergency air brakes, the engine crashed into the truck. Such was the train's speed that the engine did not come to a stop until it had traveled almost three-fourths of a mile past the collision point.

Thornton, the engineer, testified that he saw the truck just before it turned into Black Lane. At variance from the fireman, the engineer estimated the locomotive was then 20 to 25 car lengths (800 to 1,000 feet) south of the Black Lane crossing. He saw the truck move toward the tracks, and when it came close to the rails, he applied the emergency air brakes. Other evidence established that just before the collision the truck had come to a stop with its front wheels resting between the westerly pair of rails on which the Shasta Daylight was traveling. There was no evidence that the truck halted its progress at any point until it moved onto the tracks.

Although the train's whistle is mentioned at many points in the transcript, there were also references to the blowing of an air horn. Apparently counsel and witnesses were referring to the whistle and air horn interchangeably. Fireman Anderson testified that he was ringing the bell constantly as the

train approached the Black Lane crossing and that the air horn was sounding. Engineer Thornton testified that he commenced sounding the whistle 120 feet south of a "whistle post" which was located 1,248 feet south of the crossing. Jepson, the rear brakeman, testified that the train whistle sounded continuously as it approached the crossing.

Plaintiffs' witnesses included three ladies who lived in the vicinity, all of whom heard but did not see the crash. One lady, aged 70, testified that she heard no bell or whistle before the crash; that she is hard of hearing, especially on low tones; on cross-examination, she stated that she didn't *know* the whistle was not blowing but she didn't *believe* it did. Another lady testified categorically on direct examination that no whistle or bell sounded before the impact; then, on cross-examination, that she could not swear that she had not heard the whistle, also that she did not know whether it was blowing. A third lady stated that she did not believe she heard the whistle; on cross-examination, that she had not heard the approaching train either.

Plaintiffs introduced testimony and a series of photographs designed to show that a driver approaching the crossing could not get a clear view of the tracks either to the north or south because of trees and shrubs growing in the 60-foot strip between Balls Ferry Road and the tracks; that the obstructions to a northward view would occupy the driver's mind, thus diminishing to some extent his ability to concentrate on a view toward the south; that similar growth, as well as utility poles, toward the south, impaired the driver's ability to see the approaching train. A diagram was introduced for the same purpose. Diagrams and speed calculations were introduced with the objective of demonstrating that when the slow-moving truck entered Black Lane the speeding Shasta Daylight was hundreds of feet south of the crossing and beyond the impaired range of decedent's view. Without attempting to summarize this data, we point to one example, based upon an assumed truck speed of 15 miles per hour and an assumed train speed of 79 miles per hour. On that assumption, which is one of constant speed on the part of both vehicles, the train was 348 feet south of the impact point when the truck was 66 feet away, or just about in the turn into Black Lane.[2]

[2]On similar speed assumptions, but with the additional assumption that the truck came to rest on the tracks one second before the impact, the train would have been 464 feet south of the collision point when the truck was 66 feet away. Plaintiffs point out that if decedent's heavy

A highway patrolman who investigated the accident was called by the defense. His testimony tended to show that at isolated points along the crossing approach there were some obstructions to a southward view of the tracks, but at no point was southward vision of an approaching 15-foot high engine impaired. A defense photograph also tended to demonstrate a comparatively clear southward view down the tracks.

As the case was presented to the jury, the evidence and jury instructions created four principal issues of liability:

First, the railroad's negligence in terms of the design and maintenance of the crossing. Not only were trees and shrubs said to obscure the driver's view of the approaching train; in the 20 years since the construction of the crossing, population and traffic in the neighborhood had increased; permissible train speed had been raised from 60 to 79 miles per hour; two earlier accidents at that crossing, one of them fatal, put the railroad on notice of danger. Yet the Southern Pacific Company had not seen fit to install automatic warning signals or gates. A civil engineer testified that the 8 per cent grade on a portion of the approach made it difficult for a heavy truck and trailer to come to a stop at the crossing sign.[3]

Second, the railroad's negligence in terms of the 78 mile per hour train speed, assertedly excessive at an unguarded crossing in a populated area.

Third, the railroad's negligence in assertedly failing to sound bell and whistle. As noted, the evidence on this score was in conflict. The whistle post, required by a company rule to be one-quarter mile from the crossing, was actually 72 feet closer. On the other hand, members of the train crew had testified that the whistle was blowing before the engine passed the post.

Fourth, the issue of decedent's contributory negligence.

Whether the railroad was negligent in the design and maintenance of the crossing or in the speed of the train was a

truck and trailer stopped approximaetly 60 feet from the crossing before proceeding onto the tracks, the train would have been 2400 feet south of the crossing and completely out of view when the truck commenced to move forward. The only eyewitnesses, the railroad engineer and fireman, testified that the truck did not stop before it was driven on the tracks.

[3] In a 20-foot stretch of road, the difference in elevation created by a (permissible) 6 per cent grade and an (impermissible) 8 per cent grade would amount to less than 5 inches.

question of fact for the jury. (*Peri* v. *Los Angeles Junction Ry.*, 22 Cal.2d 111, 120-122 [137 P.2d 441].) The trial judge specifically instructed the jury that the condition of the crossing, sufficiency of warning devices and speed of the train were factors in determing the railroad's negligence. The cumulative effect of plaintiffs' evidence was a fairly strong showing of negligence on the part of the defendant railroad, which would have amply justified a verdict for plaintiffs in the absence of contributory negligence.

There was strong evidence of contributory negligence, however. The day was clear, the tracks and crossing sign in full view. The only eyewitnesses had testified that the truck had turned into Black Lane and had been in continuous motion until it stopped on the tracks. There was evidence that decedent, who was in the excavation business, lived in a nearby community and (inferably) was familiar with the crossing. To rebut contributory negligence, plaintiffs attempted to demonstrate that various characteristics of the crossing, including the grade, imposed driving tasks which would tend to distract a driver's attention from approaching trains; that the absence of bell or whistle would be an added element in encouraging his forward movement across the tracks; that the sound of the approaching engine was diminished by a slight downward grade in the tracks; that the truck would itself produce noise within the cab, hampering decedent's ability to hear; that the diagonal direction of the crossing would require the driver to look over his shoulder in order to view the tracks to the south. Additionally, plaintiffs had the benefit of a presumption that decedent exercised reasonable care for his own safety, and the jury were so instructed. (*Scott* v. *Burke*, 39 Cal.2d 388, 394-395 [247 P.2d 313] ; *Murphy* v. *Atchison, T. & S.F.Ry.*, *supra*, 162 Cal.App.2d at pp. 821-822.)

A railroad track is itself a warning of danger and a driver intending to cross must avail himself of every opportunity to look and listen; if there are obstructions to the view, he is required to take greater care. (*Will* v. *Southern Pacific Co.*, 18 Cal.2d 468, 474 [116 P.2d 44].) Neither decedent's actual or alleged failure to stop, nor the presence of obstructions, made him guilty of contributory negligence as a matter of law. Yet, these were factors in the jury's determination of contributory negligence as a fact question. "Whether his failure to stop, the place from which he looks, and the character and extent of the

obstruction, if any, are such that a reasonably prudent person would not have conducted himself as the driver did, are questions for the jury in determining whether he was guilty of contributory negligence as a matter of fact." (*Anello* v. *Southern Pacific Co.*, 174 Cal.App.2d 317, 321 [344 P.2d 843]; *Green* v. *Key System Transit Lines*, 116 Cal.App.2d 512, 519 [253 P.2d 780].) If, as the defense claimed, decedent had a clear southward view of the approaching train, he would have been negligent in moving into a position of obvious danger; if, as plaintiffs contended, his vision was obstructed or his hearing hampered, the jury would have been justified in finding that he negligently failed to assure himself a clear track.

Even had the jury been disposed to find a failure to sound bell and whistle, such a finding would have been far from decisive of the contributory negligence issue. ▮ Violation of the railroad's statutory duty to sound bell and whistle at a highway crossing does not absolve a driver from his failure to look and listen and, if necessitated by circumstances such as obstructed vision, even to stop. (*Hutson* v. *Southern California Ry. Co.*, 150 Cal. 701, 703 [89 P. 1093]; *Robbins* v. *Southern Pacific Co.*, 102 Cal.App. 744, 749 [283 P.850].) The court instructed the jury to that general effect. (BAJI 203, last paragraph.)

▮ As the case went to the jury, the issue of contributory negligence bulked large in the evidence. It was a primary theme of defense counsel's jury argument, and the trial judge instructed the jury on the subject. Evidence for and against it was weighty, and the jury's determination, one way or the other, would have ample evidentiary support. Comparatively puny and isolated was the issue raised by the erroneous instruction on excuse or justification for breach of statutory duty. Silence of bell and whistle had practical relevance in the determination of contributory negligence. (*Vaca* v. *Southern Pacific Co.*, 91 Cal.App. 470, 478 [267 P. 346].) Excuse or justification for that silence did not. Defendant railroad might or might not be excused from its statutory duty to sound bell and whistle, but such an excuse had no significance in deciding whether decedent truck driver used reasonable care for his own safety. The unwarranted portion of Instruction No. 38 could not have misled the jury in its determination of contributory negligence.

The very fact which makes the instruction on excuse or justification erroneous—absence of any evidence to support

it—suggests that the jury ignored this dim will-o'-the-wisp and passed on to the tangible issues in the case. Indeed, in Instruction No. 4 the court told them to disregard any instruction not justified by the facts. (BAJI 35-A, as modified.) ██ We must assume that the jury understood the instructions and correctly applied them to the facts. (*Nunneley* v. *Edgar Hotel*, 36 Cal.2d 493, 500 [225 P.2d 497].) On that assumption, the jury found no excuse or justification, for there was no evidence of either.

██ That the jury, in view of the evidence, might have reached the opposite verdict does not call for reversal. Reversal is in order only if the error was a factor in the verdict it did reach. (*People* v. *Watson, supra,* 46 Cal.2d at pp. 836-837.) ██ We find no reasonable probability that the erroneous instruction affected the jury's verdict. Notwithstanding the error, there was no miscarriage of justice.

Judgment affirmed.

Pierce, P. J., and Schottky, J., concurred.