[Civ. No. 23398. First Dist., Div. One. Feb. 5, 1968.]

EDNORA HARRIS, Plaintiff and Appellant, v. JERRY B. BELTON et al., Defendants and Respondents.

Fred G. Meis for Plaintiff and Appellant.

Ericksen, Ericksen, Kincaid & Bridgman and Frederic G. Nave for Defendants and Respondents.

SIMS, J.—Plaintiff, who seeks to recover damages from the retailer and the manufacturer of a skin tone cream for the burning, irritation, darkening and scarring of the skin on her face and neck, allegedly caused by the use of that cream, has appealed from a judgment entered on a verdict for the defendants.

She contends that the trial court erred in failing to give three instructions offered by her which set forth the duties imposed on defendants by state and federal statutes, and in giving an instruction which submitted to the jury the question of whether any breach of statutory duty was excusable or justifiable when there was no evidence to support such a conclusion. She also asserts that the court erred in refusing to give a proffered instruction on damages for breach of warranty. She further claims that there is no substantial evidence in the record to sustain the jury's finding that the defendants did not breach expressed and implied warranties in the sale of the skin tone cream to plaintiff. No prejudicial error is found in the manner in which the jury was instructed, and the evidence does not require a finding for plaintiff as a matter of law. The judgment must be affirmed.

### Sufficiency of the Evidence

Plaintiff's complaint sets forth five causes of action.[1] The first cause of action alleges breach of an express warranty by

---

[1]In the first cause of action, plaintiff alleged that defendant Pharmaco, Incorporated, manufactured the cosmetic product known as Artra Skin Tone Cream, that Artra was sold and distributed by Pharmaco, for sale to and use by the general public as a skin cream, that defendants Belton, individually and as copartners doing business as Regal Barber and Beauty Supply, were and are engaged in a retail beauty supply business in San Francisco; that Pharmaco, through its extensive advertisements in newspapers, magazines, and store displays expressly warranted to all who might use Artra, including plaintiff, that the cosmetic would, gently

Pharmaco, Incorporated, the manufacturer; the second, breach of an express warranty by defendants Belton, doing business as Regal Barber and Beauty Supply, the retailer; the third, breach of an implied warranty by the manufacturer and retailer; the fourth, negligence on the part of the manufacturer; and the fifth, negligence on the part of the retailer.

In support of her theory of express warranty plaintiff introduced in evidence an advertisement, from a magazine directed to Negro readers, for Artra Skin Tone Cream which reads: "LIGHTER, LOVELIER SKIN BEAUTY FOR YOU . . . THE ARTRA PROMISE Artra promises—a complexion fresh and bright as springtime. Soft and glowing as candlelight! Artra, with miracle-magic Hydroquinone, acts gently, but with deep-down thoroughness—to lighten and brighten your skin. To cream your skin to luxurious softness, too. And without oiliness—because Artra vanishes! Try Artra today. That famous Artra look can belong to *you!*"

and safely, soften and lighten the skin, that by reason of the express warranty, plaintiff purchased a tube of Artra in June 1962 from the Beltons, that plaintiff in reliance on the express warranties used the cream on her face and neck, as directed in the instructions accompanying the cream, that the cream did not gently and safely soften and lighten her skin, but instead burned, deeply irritated, darkened and scarred plaintiff's face and neck, and that as a direct and proximate result of the foregoing plaintiff sustained injury and damage.

In the second cause of action plaintiff incorporated parts of the first cause of action by reference, and alleged that the Beltons expressly warranted to plaintiff in their sale to her of the cosmetic that it would safely and gently soften and lighten her skin, and that as a direct result of her use of the cream, she has sustained injury and damage.

In the third cause of action plaintiff alleged that Beltons and Pharmaco, in the sale of said cosmetic, impliedly warranted that it was fit for its intended purpose, that it was wholesome, noninjurious and did not contain any harmful substances. That said implied warranty was breached, to plaintiff's injury and damage.

In the fourth cause of action plaintiff alleged that defendant Pharmaco, was negligent for including the chemical ingredient known as Hydroquinone in the manufacture of Artra, since such ingredient was known to said defendant to be highly dangerous to the skin of a large number of persons. Plaintiff further alleged that defendant Pharmaco was negligent in failing to warn plaintiff by a statement on the cosmetic container, or otherwise, of the known dangers to be encountered in the use of Artra. In addition, plaintiff alleged that defendant Pharmaco was negligent in representing to plaintiff by advertisement that said Artra was safe and harmless and would not irritate the skin. That by reason of said negligence, plaintiff suffered injury and damage.

In the fifth cause of action plaintiff alleged that the Beltons were negligent in that they knew that Artra was irritating to the skin, and, knowing that plaintiff intended to use said cosmetic on her skin, nevertheless failed to warn plaintiff of the known dangers to be encountered through its use. That as a direct and proximate result of said failure to warn, as aforesaid, plaintiff suffered injury and damage.

She also produced a standing poster advertising the product which recited: "For a skin that is gloriously LIGHTER BRIGHTER SOFTER Clears Complexion NEW ARTRA SKIN TONE CREAM with the miracle beauty ingredient Hydroquinone."

The box in which the purchased tube of skin tone cream was packaged bears the following: "ARTRA SKIN TONE CREAM contains HYDROQUINONE lightens, brightens, softens skin. Skin Tone Cream is a greaseless vanishing cream for lightening skin, with these additional skin care benefits. Softens skin— Eases removal of blackheads—Protects skin against sunburn. Directions: Place small amount of ARTRA on fingertips, smooth on face, arms, legs, etc. Allow it to soften skin for one or two minutes. Place more ARTRA on fingertips and smooth on skin until it vanishes. Use ARTRA once or twice daily, as desired. NOTE: FOR FULL DIRECTIONS READ ENCLOSED PAMPHLET."

On the tube itself the statements and directions outlined above are repeated in substance, and, in addition, following the directions, the text states: "NOTE: For full directions read accompanying pamphlet. Some individuals are allergic or sensitive to certain foods, drugs, or cosmetics. If irritation appears, discontinue use of this cream."

The pamphlet referred to on the package and on the tube repeats the manufacturer's claims, the directions, and the warning concerning individual sensitivity. The last is preceded by the following: "IMPORTANT: Do not use Artra with other skin bleaches! Mixing Artra with other cosmetic bleaches may lead to dangerous skin irritations. For best results, *use only* Artra. . . ."

Sometime in June 1962 plaintiff entered the Regal Barber and Beauty Supply Store in San Francisco to purchase beauty supplies. Regal is a wholesale supplier of beauty aids, and for at least two years plaintiff had been making purchases at Regal at a discount, on the basis that she was a beauty operator, although she had not as yet obtained a California license. Plaintiff was working as a nurse in 1962, but she held a Missouri license as a beauty operator, and had taken a prescribed course as a hairdresser and cosmetologist. She purchased items at Regal to work on friends.

Plaintiff testified that on this particular occasion in June, after she made her regular purchases and was about to leave, she noted a "standing poster" similar to that described above, advertising Artra Skin Tone Cream. She had previously seen pictures of the product, and had read the magazine advertisements, although she had not paid particular atten-

tion to what the advertisements claimed the article could do. According to plaintiff, she asked the coowner of Regal, Mrs. Belton, if she could use the cream as a foundation, and Mrs. Belton replied that she could, that Artra ''was a good seller and it was used quite a bit and that [she] should try it.'' Plaintiff purchased the Artra. She testified that when she purchased the cream she did not know it was a skin lightener, and that she was only interested in purchasing a skin cream.

Mrs. Belton testified that during the time plaintiff had been buying from Regal, she had complained, on several occasions, about the darkness of her complexion. According to Mrs. Belton, the sale occurred June 20, 1962, and the following discussion occurred: Plaintiff said, '' 'Mrs. Belton, what is that Artra?' I said, 'What do you mean, what do I think of Artra?' She said, 'Well, it's supposed to be pretty good for lightening the skin, isn't it?' I said, 'I don't know for sure, but the customers say so. You know, just kind of shooed it off, and she said, 'I would do anything to get my skin lighter' . . . and she said, 'Which one of these have you used,' and I said, 'I'm sorry, Honey, I can't use anything.' I said, 'I have a sensitive skin and I am not bothered to use anything on it.' And she said, 'Well, oh, I've never been able to use anything but Dorothy Gray's, but they don't have any bleach in it, and I just want my skin light.'—Things like that.''

Plaintiff testified that she used the cream on the very day of her purchase. First, she gave herself a patch test. She did not have any reaction, and that evening she followed the directions contained on the carton, washed her face, dabbed on the cream, and rubbed it into the skin on her face and neck. After the first full application, she had to go out to make additional forgotten purchases, and she removed the original application. When she returned from her shopping, she again applied Artra. She applied Artra, for the third time, on the following afternoon before going to work.

After she reported to work her skin began to itch, and she felt very warm. She washed her face, but ''During the eight hours that I worked it continued to be annoying and itching and burn[ing], and I just kept going into the washroom to wash it off, and just putting cold water on my face to sooth the burning.'' On the third day, plaintiff's skin continued to burn, she noticed some small pimples, her skin became tighter, and she had swelling about her eyes. When she applied powder to her face, she noticed some flaking. Plaintiff testified she returned to Regal, and complained of the results. According

to plaintiff, Mrs. Belton stated that swelling and irritation "often occurs when someone uses the cream, but that if I continued my skin would clear."

Mrs. Belton testified that plaintiff registered no complaint when she came in the store about a month after the purchase; and that subsequently, in a phone call, for the first time she stated her skin was irritated.

Plaintiff first consulted a doctor about her skin condition in July. At that time her skin had grown worse, and the color had begun to get darker. She testified that prior to visiting the doctor, and after using Artra, she used Unguentine, Dermassage, lanolin, and glycerine on her face. The first doctor she visited gave her medication, and told her she could use "Basis Soap" on her face. Plaintiff testified she had never used Basis Soap prior to this time. She subsequently saw other doctors, including Dr. Schneidman, who testified as a witness for plaintiff. Plaintiff testified that as of the time of trial her skin was still very irritated, especially in warm weather, or in a warm room. However, there was no longer swelling, and her skin had grown lighter, although her skin was still "jet black" around, and over her eyes, and about her neck. Plaintiff testified that she had used Dorothy Gray lotion and Charles of the Ritz face powder prior to June 1962, that she never used any cream on her face prior to this time, but only used powder and lipstick, that she had her hair tinted prior to the occurrence with Artra, that she also may have used turtle oil to treat herself after the use of Artra, and that she had never had any kind of skin condition or hair condition. Plaintiff was given three patch tests to determine whether she was allergic to Artra. She reacted positively to only one of the tests.

Two of plaintiff's friends, and a former employer, testified that plaintiff's skin was darker and of a different texture after June 1962, than when they had known her, respectively, eight, seven, and two years prior to the post-1962 observation. They also indicated they noticed a change for the worse in plaintiff's personality and mannerisms after June 1962. Mrs. Belton testified that plaintiff's complexion at the time of trial was the same as it was prior to the sale to her of Artra.

Dr. Schneidman first saw the plaintiff on August 31, 1962. She complained of a skin eruption on her face. Pictures of her taken by him on that day evidence the flaking and dark areas of the skin. According to the doctor's records, plaintiff's history disclosed that she first noticed itching involving her face

about June 1, 1962. She advised him she had used Artra Skin Tone Cream, and that after the outbreak of her dermatitis and prior to seeing the first doctor, who had treated her for about three weeks prior to August 31st, she had used the preparations referred to in her testimony. He testified he last saw the plaintiff on December 22, 1964, at which time he found her skin hyperpigmented.

Dr. Schneidman affirmed his opinion, expressed in a letter as follows: "Since I did not see the dermatitis immediately after it appeared, it is difficult to give a definite opinion as to the cause of the dermatitis. My impression is that she was irritated by the Artra Cream which set into motion a sequence of events leading to her present skin disorder. This initial irritation by the Artra Cream was further aggravated by the treatment which was applied by the patient. Often a single application can trigger, or initiate a single reaction in a patient. If this initial irritation is treated too strongly, a secondary or superimposed irritation may appear. Since the history revealed that there was no previous skin disorder in the patient, and since the Artra Cream was the only new substance that was applied to the skin prior to the onset of her dermatitis, it is highly suggested that the Artra Cream was the link in her dermatitis." This opinion was predicated on the history given him by the plaintiff, his physical examination of her, and his experience in handling reactions of the skin of all types. In his opinion the dermatitis, or irritation of the skin, was the result of a chemical reacting directly with the skin, rather than an irritation of the allergic type. He reached this conclusion because a seven-day test of the cream on the skin failed to produce a reaction, because the chemical reactions will occur almost immediately (as allegedly happened in this case), and because allergic reactions usually will produce an almost immediate reaction (such as allegedly suffered by plaintiff), about seven days after the initial application. He also felt that plaintiff's condition of hyperpigmentation which existed at the time of trial could be connected with the use of the Artra Skin Tone Cream.

The cream admittedly contained 5 percent of a substance known as hydroquinone, which is used as a bleaching agent for the skin because it either directly or indirectly interferes with the chemical reaction which is necessary for the color and development of pigmentation.

Dr. Schneidman testified that hydroquinone was a skin irritant, which, when used on the skin could cause it to swell,

burn, itch, flake and peel, and also could cause hyperpigmentation, or darkening of the skin, which would last for an indefinite period of time. According to him, hydroquinone was known to give different reactions in the skins of Negroes than Caucasians, in that the reaction was one of protecting the color of the skin of the Negro, and was very unpredictable, leading to either lightening or darkening of the skin. In his opinion, approximately 5 percent of the people using Artra would be irritated in some form, and that percentage would be higher among Negroes. He acknowledged that he prescribed Artra Skin Tone Cream for his Caucasian patients who desired to have their skin lightened or bleached, and that he controlled the administration of the cream by telling them that if an irritation appeared, they should stop its use immediately. He also qualified his testimony by admitting that a primary irritant was a substance which would irritate the majority of normal people who used it; and that a product which only adversely affected 5 percent of its users would not be considered a primary irritant.

Plaintiff also produced a forensic chemist who testified that the Artra Cream used by plaintiff contained 4.5 percent of hydroquinone; that hydroquinone was mainly used as a photographic developer; and that it was irritating to the skin. His experience with the substance as a skin irritant had been with a 12½ percent solution.

An officer of the manufacturer testified that Artra was first marketed in 1958. He described the sales per tube per year through the first three months of 1965, as follows: 1959—840,891; 1960—1,375,077; 1961—2,037,385; 1962—2,537,933; 1963—3,367,793; 1964—4,015,071; and from January through March 1965 (three months), 1,118,834. He also indicated the number of complaints received per year as follows: 38—1962; 46—1963; 29—1964; 7—first three months of 1965. These complaints disclosed reactions which seemed to be allergic contact dermatitis.

Doctor Neary, a licensed physician and surgeon in New Jersey and director of Pharmaco, testified that tests indicated that Artra was a safe and effective product, that it caused unusual reactions in only 1 or 2 percent of Negro and white users, that generally such reactions were diagnosed as either mild or pronounced allergic contact dermatitis, that plaintiff's reaction might have been such a reaction, that there is no fixed time for an allergic reaction, that a product could be used for years with no ill effects, ''and suddenly, on using the

same preparation," one might develop an allergic reaction, and that postinflammatory hyperpigmentation could result from the use of Artra.

The doctor acknowledged that the irritation which did occur from use of the cream was caused by the hydroquinone in the product; that the hyperpigmentation which occurred was from the inflammation which resulted; and that hyperpigmentation was more apt to occur in Negroes from an inflammation, regardless of the cause of the inflammation. He stated that on the average only two or three dozen complaints per year concerning the use of the product had come to his attention.

Plaintiff contends that the evidence compels findings that the defendant manufacturer had, in labeling and advertising its product, expressly warranted that it contained a certain ingredient, and that it was suitable for a given purpose; that plaintiff purchased the cosmetic because of and in reliance upon the express warranties, and put it to the use contemplated by the labeling and advertisements; and that the effect of the use of the cosmetic on plaintiff's skin was not as expressly warranted, but, rather resulted in the burning, irritation, darkening and scarring of the skin on her face and neck. She further asserts that she has established, as a matter of law, breach of implied warranty in that the product was not of merchantable quality (Com. Code, § 2314 [former Civ. Code, § 1735, subd. 2]), and was not reasonably suited for the ordinary uses and purpose for which a cosmetic of that type is produced and manufactured (Com. Code, § 2314 [former Civ. Code, § 1735, subd. 1]).

There are several considerations which preclude making a finding for plaintiff as a matter of law. Plaintiff is entitled to use the advertisement, the labels, and the pamphlet to show the statements made by the manufacturer with respect to its product. (*Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 13 [45 Cal.Rptr. 17, 403 P.2d 145]; *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 60, fn. 1 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]; *Wennerholm* v. *Stanford University School of Medicine* (1942) 20 Cal.2d 713, 715-716 [128 P.2d 522, 141 A.L.R. 1358]; *Corporation of the Presiding Bishop* v. *Cavanaugh* (1963) 217 Cal.App.2d 492, 512-513 [32 Cal.Rptr. 144]; *Rose* v. *Chrysler Motors Corp.* (1963) 212 Cal.App.2d 755, 757-758 [28 Cal.Rptr. 185, 99 A.L.R.2d 1411]; *Maecherlein* v. *Sealy Mattress Co.* (1956) 145 Cal. App.2d 275, 276 [302 P.2d 331]; *Lane* v. *C. A. Swanson & Sons*

(1955) 130 Cal.App.2d 210, 215-216 [278 P.2d 723]; *Free* v. *Sluss* (1948) 87 Cal.App.2d Supp. 933, 936-937 [197 P.2d 854].) These claims, however, are for the most part recognizable as generalities promulgated to attract attention and subsequent sales, and when analyzed, do not transcend the implied warranty that the product is suitable for use for the purpose for which it is intended. (See *Alexander* v. *Stone* (1916) 29 Cal. App. 488, 490 [156 P. 998]; *Corporation of the Presiding Bishop v. Cavanaugh, supra,* 217 Cal.App.2d 492, 504; Com. Code, § 2313, subd. 2 [former Civ. Code, § 1732]; and cf. *Proctor & Gamble Mfg. Co.* v. *Superior Court* (1954) 124 Cal. App.2d 157, 162 [268 P.2d 199]; and *Pacific Feed Co.* v. *Kennel* (1923) 63 Cal.App. 108, 113 [218 P. 274].) Furthermore, the representations upon which plaintiff relies must be taken as a whole. ■ She admittedly read the instructions on the tube and in the pamphlet, and went so far as to give herself a patch test. She, therefore, cannot claim that there was an express warranty that the cream was good for all skins. Concededly, she knew before she used it that it would irritate some individuals who were allergic or sensitive to it.

■ There is no evidence to show that the cream actually used was defective in the sense that it was not manufactured in accordance with the tested standards for Artra Skin Tone Cream. There is evidence which indicates that cream so manufactured may be safely used by at least 98 percent of the public, and that any untoward effects are caused by allergy or the sensitivity of the skin of the user. Under these circumstances there is no breach of any implied warranty, unless the circumstances evidence a duty to warn the consumer and a failure to give such warning. (*Briggs* v. *National Industries, Inc.* (1949) 92 Cal.App.2d 542, 546 [207 P.2d 110]; and *Zager* v. *F. W. Woolworth Co.* (1939) 30 Cal.App.2d 324, 332-333 [86 P.2d 389].)

■ In determining whether there is a breach of an implied warranty of merchantability because a product can cause damage or injury to particular sensitive users, it is necessary to establish that the manufacturer or retailer knew or should know that the product will affect a recognizable number of users. (*Proctor & Gamble Mfg. Co.* v. *Superior Court, supra,* 124 Cal.App.2d 157, 162; *Briggs* v. *National Industries, Inc., supra,* 92 Cal.App.2d 542, 546; and see *Tingey* v. *E. F. Houghton & Co.* (1947) 30 Cal.2d 97, 102-103 [179 P.2d 807]; *Crane* v. *Sears Roebuck & Co.* (1963) 218 Cal.App.2d 855, 859 and 860-861 [32 Cal.Rptr. 754]; *Magee* v. *Wyeth Laboratories, Inc.* (1963) 214 Cal.App.2d 340, 352 [29

Cal.Rptr. 322]; *Arata* v. *Tonegato* (1957) 152 Cal.App.2d 837, 842-843 [314 P.2d 130]; *Gall* v. *Union Ice Co.* (1951) 108 Cal.App.2d 303, 309-310 [239 P.2d 48]; and Horowitz, *Allergy of the Plaintiff as a Defense in Actions Based Upon Breach of Implied Warranty of Quality* (1951) 24 So.Cal.L. Rev. 221. Cf. 2 Rest.2d Torts, § 402A, coms., g, h, i, j and k, pp. 347-348 and 351-354.) The evidence here compels a finding that from 2 to 5 percent, or perhaps more with Negro users, will be affected by the use of the cream. The law, however, does not prohibit the manufacture and sale of such a product, but requires that the consumer be advised of the possibility of untoward consequences. (*Love* v. *Wolf* (1964) 226 Cal.App.2d 378, 394-395 and 402-403 [38 Cal.Rptr. 183]; *Magee* v. *Wyeth Laboratories, Inc., supra,* 214 Cal.App.2d 340, 350; *Arata* v. *Tonegato, supra,* 152 Cal.App.2d 837, 843-844, and see other authorities last cited.) The evidence here supports an implied finding that an adequate warning was given.

Furthermore, the record is not decisive on the question of causation. There is some evidence from which it can be inferred that the plaintiff suffered from some sort of irritation before she purchased the Artra Cream. Other evidence suggests that her attempts at self-treatment may have aggravated a minor irritation produced by the cream and been the principal cause of the injuries of which she ultimately complained. The guarded diagnosis of Dr. Schneidman, predicated upon examination well over two months after the alleged onset, does not compel a contrary conclusion. "Since the testimony on causation was in conflict, the trial court's resolution of the conflict is controlling." (*Seely* v. *White Motor Co., supra,* 63 Cal.2d 9, 19; and see *Magee* v. *Wyeth Laboratories, Inc., supra,* 214 Cal.App.2d 340-352.)

Similar considerations apply to plaintiff's contentions that the manufacturer and retailer were negligent. (See 2 Rest. 2d Torts, § 388, coms. g and h, pp. 300-301, 304, 307-310; *id.,* § 395, coms. j and k, pp. 325, 330-331; and *id.,* § 401, coms. c, d, e, f, g and k, pp. 339, 340-342 and 344-345.) The fact that the evidence might support a finding of negligence against the manufacturer, or supplier, on one or more of several theories, does not establish such negligence as a matter of law. The evidence in this case is susceptible to conflicting inferences as to whether the duty, if established, was fulfilled by proper warning, and is open to conflicting findings on the issue of causation.

■ Consideration has also been given to the theories of strict liability. (*Greenman* v. *Yuba Power Products, Inc.*, *supra,* 59 Cal.2d 57, 62-64; and see *Seely* v. *White Motor Co.*, *supra,* 63 Cal.2d 9, 15-19; 2 Rest.2d Torts, § 402A, coms. g, h, i, j and k, pp. 347-348 and 351-354; and Prosser, *Strict Liability to the Consumer in California* (1966) 18 Hastings L.J. 9.) The Restatement indicates: ''In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. . . . Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.'' (*Op.cit.*, com. j, p. 353.)

It may be argued that the economic argument for imposing strict liability (see *Greenman* v. *Yuba Power Products, Inc.*, *supra,* 59 Cal.2d at p. 63) should be applied, so that the cost of injuries resulting from the use of a product which is harmful to substantial numbers of the population should be placed on the manufacturer and in turn be distributed by him over the vast number of consumers who enjoy the product free from injury. ■ The *Greenman* rationale presupposes that the injured person is helpless to protect himself because of defect in the product. Here the injury results from a combination of the ingredients of a product, ordinarily safe for use, and the particular susceptibility of the consumer. Under these circumstances where a proper warning is given, it is not unreasonable to put the burden on the consumer to protect himself.[2] ■ The record in this case supports the implied

---

[2] Warning of the dangers from the use of a product, otherwise safe, by an individual suffering a particular idiosyncrasy should be distinguished from an attempted disclaimer of defects actually existing in the product itself. (See *Klein* v. *Asgrow Seed Co.* (1966) 246 Cal.App.2d 87, 98 [54 Cal.Rptr. 609].)

finding of the jury that a proper warning was given. On the facts of this case it cannot be ascertained as a matter of law that the serious consequences allegedly suffered by plaintiff would generally have been suffered by a person allergic to or sensitive to Artra Cream or whether she was particularly more sensitive, or whether she aggravated the results by her self-treatment. No opinion is expressed in regard to the situation where the known possibility of serious injury is great, and the sensitive or allergic user, despite the warning, can only determine his susceptibility after use and consequent grave injury has occurred.

 Reliance on a theory of misrepresentation predicated upon the advertising and other claims made by the manufacturer (see *Wennerholm* v. *Stanford University School of Medicine, supra,* 20 Cal.2d 713, 716; and see 2 Rest.2d Torts, § 402B, coms. f, g, h and j, pp. 358 and 360-362) is forestalled by the evidence which shows that the warning was given and actually read by the claimant.

Plaintiff's contention that she is entitled to recover as a matter of law must be rejected.

*Instructions on Statutory Breach of Duty*

Plaintiff offered an instruction, denominated and hereinafter referred to as "No. 18," which linked together the provisions of various sections of the chapter of the Health and Safety Code dealing with cosmetics. This instruction is set forth in the margin with the section numbers inserted in brackets.[3]

---

[3] *"Plaintiff's Instruction No. 18*

"In the sale of Artra Skin Tone Cream, defendant, PHARMACO INCORPORATED, was subject, among other things, to the provisions of the Health and Safety Code of the State of California.

"The Health and Safety Code of the State of California provides that the following acts and the causing thereof in the State of California are prohibited: (a) the manufacture, sale or delivery, holding or offering for sale, of any cosmetic that is adulterated or misbranded; (b) the adulteration or the misbranding of any cosmetic; (c) the receipt in commerce of any cosmetic that is adulterated or misbranded or the delivery or proffered delivery thereof for pay or otherwise; and (d) the dissemination of any false advertisement. [§ 26041, portion.]

"The Health and Safety Code of the State of California provides that a 'cosmetic' means: (a) articles intended to be rubbed, poured, sprinkled or sprayed on, introduced into, or otherwise applied to, the human body or any part thereof for cleansing, beautifying, promoting attractiveness or altering the appearance, and (b) articles intended for use as a component of any such articles. The term shall not include soap. [§ 26001.]

"The Health and Safety Code of the State of California provides that 'label' or 'labeling' means the display of written, printed or graphic

A second instruction, referred to as "No. 19," set forth substantially verbatim provisions taken from the "Federal Hazardous Substances Labeling Act." (Pub.L. 86-613, §§ 2-14, July 12, 1960; 74 Stat. 372-379; 15 U.S.C.A. §§ 1261-1273, as amended.) This instruction is set forth in the margin, with

matter upon the immediate container of any article. A requirement made by or under the authority of this chapter is that any word, statement or other information appearing on the label shall not be considered to be complied with unless such word, statement or other information also appears on the outside container or wrapper, if any there be, on the retail package of such article or is easily legible through the outside container or wrapper. Under the California Health and Safety Code, the word 'label' or 'labeling' includes all labels and other written, printed or graphic matter (a) upon any article or any of its containers or wrappers, or (b) accompanying such article. [§§ 26002 and 26004.]

"The California Health and Safety Code of the State of California provides that if any article is alleged to be misbranded because the labeling is misleading, then in determining whether the label is misleading, there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device or any combination thereof, but also, the extent to which the labeling fails to reveal facts material in light of such representations or material with respect to consequences which may result from the use of the article to which the labeling relates under the conditions of use prescribed in the labeling thereof or under such conditions of use as are customary or usual. [§ 26005.]

"The California Health and Safety Code regarding the selling of cosmetics shall be considered to include the manufacture, production, processing, packaging, exhibition, offering, possessing, and holding of any such article; and the supplying or applying of any such article in the conduct of any cosmetic establishment. [§ 26007.]

"Under the California Health and Safety Code the word 'package' includes any phial, bottle, jar, demijohn, carton, bag, case, can, box or barrel or any receptacle, vessel or container of whatsoever material or nature which may be used by a manufacturer, producer, jobber, packer or dealer for enclosing or containing any cosmetic. [§ 26008.]

"Under the California Health and Safety Code a cosmetic shall be deemed to be adulterated if it bears or contains any poisonous or deleterious substance which can render it injurious to customers in the use prescribed in the labeling thereof under such conditions of use as are customary or usual. [§ 26021, portion.]

"Under the California Health and Safety Code a cosmetic shall be deemed to be misbranded if its labeling is false or misleading in any particular. [§ 26031.]

"Under the California Health and Safety Code a cosmetic shall be deemed to be misbranded if in package form, unless it bears a label containing (a) the name and address of business of the manufacturer, packer or distributor; (b) an accurate statement of the quantity of the contents in terms of weight, measure or numerical count. [§ 26032, portion.]

"Under the California Health and Safety Code, a cosmetic shall be deemed to be misbranded if any word, statement or other information required by or under authority of this chapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or devices, in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under the customary conditions of purchase and use." [§ 26033.]

section references to title 15 of the United States Code Annotated inserted in brackets.[4]

A third instruction, designated as "No. 20," embodied provisions culled from the "Federal Food, Drug, and Cosmetic Act." (Act of June 25, 1938, ch. 675, § 1 et seq.; 52 Stat. 1040 et seq.; 21 U.S.C.A., § 301 et seq., as amended.) This instruction is set forth in the margin with section references to title 21 of the United States Code Annotated inserted in brackets.[5]

The court indorsed "No. 18," "Abridged as indicated." The disposition intended for "No. 19" is not indicated by

---

[4]*Plaintiff's Instruction No. 19*
"In the sale of Artra Skin Tone Cream, the defendant, Pharmaco Incorporated, was subject, among other things to the Federal Commerce and Trade Act relative to the labeling of hazardous substances.

"This Act provides that the following acts and the causing thereof are prohibited:

"The introduction or delivery for introduction into interstate commerce of any misbranded package of a hazardous substance. [§ 1263(a).]

"This Act provides that a product is a hazardous substance if:

"Any substance or mixture of substances which (i) is toxic, (ii) is corrosive, (iii) is an irritant, or (iv) is a strong sensitizer; if such substance or mixture of substances may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonable foreseeable handling or use. [§ 1261(f)(1)(A), portion.]

"Under this Act the term 'corrosive' means any substance which, in contact with living tissue will cause destruction of tissue by chemical action. [§ 1261(i).]

"Under this Act the term 'irritant' means any substance not 'corrosive' (within the meaning of the above stated definition of the term 'corrosive'), which, on immediate, prolonged or repeated contact with normal living tissue will induce a local inflammatory reaction. [§ 1261(j).]

"Under this Act the term 'label' means a display of written, printed or graphic matter upon the immediate container of any substance or upon the outside container or wrapper of said substance, if any there be, and upon all accompanying literature where there are directions for use, written or otherwise.

"Under this Act the term 'misbranded package' or 'misbranded package of a hazardous substance' means hazardous substance in a container intended or suitable for household use which fails to bear a label: (a) which states conspicuously the common or usual name or chemical name of the hazardous substance; (b) the single [signal] word 'danger' stated conspicuously on substances which are corrosive; (c) which states conspicuously the single [signal] word 'warning' or 'caution' on all other hazardous substances; (d) which states an affirmative statement of the particular hazard, such as 'Causes burns,' 'Absorbed through skin' or similar wording descriptive of the hazard; (e) which states the precautionary measures describing the action to be followed or avoided." [§ 1261(p)(1)(B), portion, (c) portion, (d),(e) portion, and (f) portion.]

[The last paragraph of this instruction does not appear in the clerk's transcript, but plaintiff's statement that a second page, containing that paragraph, was lodged with the court is accepted.]

[5]"*Plaintiff's Instruction No. 20*
"In the sale of Artra Skin Tone Cream, defendant, PHARMACO INCOR-

612

the record, but it appears to have been similarly abridged. "No. 20" was marked "Included in Court's Instructions."

The court instructed the jury as follows: "The California Health and Safety Code prohibits the manufacture or sale of any cosmetic that is misbranded or adulterated. It is adulterated if it contains any poisonous or deleterious, that is, harmful or hurtful substance.

"It further provides that the conditions of use and representations as to the consequences of the use of such cosmetic

---

PORATED, was subject, among other things, to the provisions of the Food, Drug & Cosmetic Act of the United States Government.

"This Act provides that the following acts and the causing thereof are prohibited:

"(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded. [§ 331(a).]

"(b) The adulteration or misbranding of any food, drug, device or cosmetic in interstate commerce. [§ 331(b).]

"This Act provides that a cosmetic shall be deemed adulterated if it bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual. [§ 361(a), portion.]

"This Act provides that a cosmetic shall be deemed to be misbranded:

"(a) If its labeling is false or misleading in any particular; and [§ 362(a).]

"(b) If in package form unless it bears a label containing an accurate statement of the quantity and [of] the contents in terms of weight, measure, or numerical count. [§ 362(b)(2), portion.]

"The term 'cosmetic' means (1) articles intended to be rubbed, poured, sprinkled or sprayed on, introduced into, or otherwise applied to the human body or any part thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance, and (2) articles intended for use as a component of any such articles; except that such term shall not include soap. [§ 321(i).]

"The term 'label' means a display of written, printed, or graphic matter upon the immediate container of any article; and a requirement made by or under authority of this chapter that any word, statement, or other information appear on the label shall not be considered to be complied with unless such word, statement, or other information also appears on the outside container or wrapper, if any there be, of the retail package of such article, or is easily legible through the outside container or wrapper. [§ 321(k).]

"The term 'labeling' means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article. [§ 321(m).]

"If an article is alleged to be misbranded because the labeling is misleading, then in determining whether the labeling is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling relates under the conditions of use prescribed in the labeling thereof or under such conditions of use as are customary or usual." [§ 321(n).]

must be placed in the label with such conspicuousness (as compared with other words, statements, designs or devices, in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under the customary conditions of purchase and use.

"It is for you, as jurors, to determine if the cosmetic herein involved contained a substance such as prohibited by this statute, and further to determine if the labeling complied with the provisions of law.

"The Federal Trade and Commerce Act prohibits the introduction into interstate commerce of any misbranded package of a hazardous substance.

"A hazardous substance is defined as any substance or mixture of substances which is (1) toxic, (2), is corrosive, (3), is an irritant, (4), is a strong sensitizer; if such substance may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonable foreseeable handling or use.

"Under this act, the term 'misbranded package' or 'misbranded package of a hazardous substance' means hazardous substance in a container intended or suitable for household use which fails to bear a label: (A) which states conspicuously the common or usual name or chemical name of the hazardous substance; (B) the single word 'DANGER' stated conspicuously on the substances which are corrosive; (C) which state conspicuously the single word 'WARNING' or 'CAUTION' on all other hazardous substances; (D) which states an affirmative statement of the particular hazard, such as 'causes burns,' 'absorbed through skin' or similar wording descriptive of the hazard; (E) which states the precautionary measures describing the action to be followed or avoided.

"It is for you as jurors to determine if the cosmetic herein involved contains any substance such as is prohibited by the Act;

"It is also for you as jurors to determine if the labeling of said cosmetic complies with the requirements of said Act."

 Comparison of the instruction given by the court with Instructions "No. 18" and "No. 19," and the provisions of the respective statutes upon which they are predicated, reveals that the deletion consists of offenses which were not at issue in the case (Health & Saf. Code, §§ 26041 subds. (b), (c) and (d); and 26032, portion), and definitions which were not necessary in the light of the admitted posture of the case. (Health & Saf. Code, §§ 26001, 26002, 26004,

614

26007 and 26008; 15 U.S.C.A., § 1261 (i), (j) and (n).) Artra Cream was concededly a cosmetic, the literature and packaging produced was admittedly related to it. The court concisely covered the prohibitions of the Health and Safety Code against the sale or manufacture of any adulterated or misbranded cosmetic (§ 26041 subd. (a)); defined adulterated (§ 26021); and gave the substance of the applicable provisions concerning misbranding (§§ 26005 and 26033). Although the language of section 26031 was omitted, that section is qualified by the provisions of section 26005 which were incorporated in the court's instructions.

The failure to include the definition from the Federal Hazardous Substances Labeling Act could not be prejudicial. There was no evidence that the cream was "corrosive." (15 U.S.C.A., § 1261(*l*).) The cream admittedly was an irritant, (*Id.*, § 1261(j).) It was conceded that the carton and tube bore labels.

The court subsequently referred to "the provisions of the Food, Drug and Cosmetic Act of the United States Government" as one of the laws governing the manufacture and sale of the cream. There was, however, no reference to the provisions of this act in the manner set forth in plaintiff's proffered Instruction No. 20 or otherwise. Nevertheless, no prejudice can be predicated upon this omission. A comparison of the provisions of the federal act, with the terms of the state prohibition embodied in the Health and Safety Code, as the latter was condensed in the court's instruction, reveals a similarity which indicates that if the jury exonerated the defendants of a violation of state law, they would have done so with respect to the federal prohibition. Moreover, it was the sale of the product, not its introduction into interstate commerce, which allegedly was the immediate cause of plaintiff's injury.[6]

It is axiomatic that a party is entitled to instructions on his theory of the case. (*Sills* v. *Los Angeles Transit Lines* (1953) 40 Cal.2d 630, 633 [255 P.2d 795]; *Berall* v. *Squaw Valley Lodge of Tahoe* (1961) 189 Cal.App.2d 540, 544-545 [11 Cal. Rptr. 316]; and see 2 Witkin, Cal. Procedure, Trial, § 52, p. 1780.) ▮ It is not error to instruct in the express

[6]The court's instructions included the manufacturer within the scope of the state's prohibition. No opinion is expressed as to whether the out-of-state manufacturer would technically only be guilty of violation of federal, as distinguished from state law. For this appeal it is sufficient to note that the jury was given an opportunity to consider misbranding and adulteration as acts prohibited by law.

words of a statute (*Garrison* v. *Pearlstein* (1924) 68 Cal.App. 334, 340 [229 P. 351]) ; and it may be prejudicial error to fail to instruct the jury of the duty imposed upon the alleged tortfeasors by statute or governmental order. (*Wilcox* v. *Southern Pac. Co.* (1961) 190 Cal.App.2d 548, 551-553 [12 Cal.Rptr. 207] ; and *Berall* v. *Squaw Valley Lodge of Tahoe, supra,* at p. 545.)

Here, as has been noted, the jury was instructed as to the essential elements of the duty imposed on the defendants by state and federal law. "A party has the right to have the jury instructed on his theory of the case and all of the issues presented. However, he does not have the right to require the court to use his phraseology. The court may modify a tendered instruction, or give an instruction of its own in lieu of a proffered instruction provided the court correctly instructs the jury on each issue covered by the tendered instruction. (See 2 Witkin, Cal. Procedure (1954) § 52-b, page 1780, and cases cited therein.)" (*Johns* v. *Ward* (1959) 170 Cal.App. 2d 780, 789 [339 P.2d 926].) "The more simply and plainly instructions can be framed and cover the issues, the better the jury will understand them. . . ." (*Estate of Keithley* (1901) 134 Cal. 9, 13-14 [66 P. 5] ; and see Shinn, P.J. concurring in *Werkman* v. *Howard Zink Corp.* (1950) 97 Cal.App.2d 418, 428-429 [218 P.2d 43].) The failure to make more specific reference to provisions of the Federal Food, Drug and Cosmetic Act, even if only to state that they were similar to the state provisions, cannot be endorsed; but, as noted, because of that similarity, it cannot be prejudicial. On the other hand, the elimination of those provisions which contain superfluous definitions and which refer to offenses which were not directly related to this case is to be commended. It demonstrates how a diligent judge can aid a jury by presenting a simple, clear and understandable statement of the applicable law. No error is found in the failure to give plaintiff's prolix instructions.

The court indicated that excuse or justification would absolve the defendants from breach of a statutory duty, in the following language: "If a party to this action violated the provisions of the Food, Drug and Cosmetic Act of the United States government, or the provisions of the Federal Commerce and Trade Act of the United States government, or the provisions of the Health & Safety Code of the State of California, just read to you, a presumption arises that he was negligent. This presumption is not conclusive. It may be over-

come by other evidence showing that under all of the circumstances surrounding the event, the conduct in question was excusable or justifiable.

"To prove that a violation of an act such as that charged in this case was excusable or justifiable so as to overcome the presumption of negligence, the evidence must support a finding that the person who violated the act did what might reasonably be expected of a person of ordinary prudence who desired to comply with the law, acting under similar circumstances."

Plaintiff contends that there was no evidence of excuse or justification and that this portion of the instructions was therefore erroneous. (*Wilkinson* v. *Southern Pac. Co.* (1964) 224 Cal.App.2d 478, 481-482 [36 Cal.Rptr. 689]; and cf. BAJI Instruction No. 149 (1964 rev.) with Instruction No. 149-A.) It appears from the record that at least the second paragraph, if not all, of the foregoing instruction was "Plaintiff's requested Instruction No. 22." The error, if any, was therefore invited and not cause for reversal. (*Yolo Water & Power Co.* v. *Hudson* (1920) 182 Cal. 48, 51 [186 P. 772]; *Carlson* v. *Glanville* (1959) 170 Cal.App.2d 246, 249 [338 P.2d 580]; and see 3 Witkin, Cal. Procedure (1954) Appeal, § 92, p. 2257.)

Furthermore, the record fails to reveal that there was any substantial issue raised as to excuse or justification. The principal contentions were whether or not the defendants had given adequate warning to a person with sensitive skin, and whether in fact the Artra Cream had caused the injury. Under these circumstances, there was no reversible error in giving the instruction of which complaint is now made. (See *Wilkinson* v. *Southern Pac. Co.*, *supra*, 224 Cal.App.2d 478, 482-490.)

*Instruction on Damages for Breach of Warranty*

Plaintiff complains of the failure to give her Instruction "No. 17" which was couched in the language of BAJI Instruction No. 171.2. She alleges that by reason of this failure, and by reason of other instructions in which the court distinguished between recovery for breach of warranty, and recovery for negligence, the court failed to tell the jury that they could award her all damages that would reasonably compensate her for any loss which was suffered as a result of the alleged breach of warranty. An examination of the record reflects that the jury was fully and properly instructed regarding the measure of damages; and that such instructions were not limited to a finding of negligence, but were equally

applicable to either theory, subject only to the caveat that there could be no double recovery. No error appears in the refusal to give the offered instruction which only would have been repetitious.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.