[Civ. No. 43032. First Dist., Div. Two. Dec. 31, 1979.]

CLYDE FOSTER, Plaintiff and Appellant, v.
GILLETTE COMPANY, Defendant and Respondent.

**COUNSEL**

Lyle C. Cavin, Jr., and Albert E. Levy for Plaintiff and Appellant.

St. Clair, Zappettini, McFetridge & Griffin, Anthony Griffin and Cyril Viadro for Defendant and Respondent.

OPINION

BARBER, J.*—Plaintiff Clyde Foster filed the within action against defendant Gillette Company to recover damages for personal injuries alleged to have been caused by a defective product manufactured by defendant. The jury returned a verdict in favor of defendant, and Foster appeals.

The occurence giving rise to this litigation took place in Foster's apartment at 172 Sixth Street, San Francisco, on the evening of September 2, 1974. At that time Foster planned to go out to dinner with two of his friends, Larry Kidder and James Stafford. He showered, combed his hair, and while still in the bathroom sprayed his hair with respondent's product, a hair spray called "The Dry Look." He described the length of his hair as being "down below my ears a little bit." Foster testified that while in his bathroom he sprayed his hair four to five seconds with defendant's product and then went into the room where his two friends were waiting for him and sat in a chair. Approximately 14 seconds after spraying his hair he started to light a cigar with his lighter. He said that he brought the flame of the lighter toward the cigar in his mouth and an instant later he went up in flames. His attorney asked him if he saw the flames and he responded: "I didn't actually see the flames, but I—I could feel the—some heat in the back area around my neck and shoulder area just within seconds after I brought the cigarette lighter up towards my face. . . ." He jumped from the chair and tried to put out the flames by rubbing against the wall, without success. He then fell to the floor and Kidder extinguished the flames with a blanket.

Mr. Stafford's deposition was read to the jury, and he described the event somewhat more dramatically: "Q. Did you see him spray something on his hair? A. Yes, sir. Q. And after he sprayed this hair stuff on his hair, what did he do? A. Well he, I heard this lighter flip and he took it out of his pocket and my son was sitting here and a big old dresser here, an old-fashioned—Q. Talking about when he was in the bathroom what did he do after he sprayed his hair in the bathroom? A. The first time when he did it he put his clothes and he put on Old Spice under his arms and combed his hair and sprayed. Q. And what did he do after he sprayed his hair? A. He came out of the bath. Q. What did he do after that? A. He came over to the chair and he took his lighter

---

*Assigned by the Chairperson of the Judicial Council.

out of his pocket just before he sat down there. Q. After he sat down, what did he do? A. He reached around my son, the best of my knowledge, picked his cigar up in an ash tray, he just had lit it, it went out. He flipped his lighter to light his cigar and it looked like he just incinerated. Q. Did he light his cigar? A. He got close to it, I don't know whether he lit it or not. It blowed it out of his face or mouth. He didn't have one when he got up off the floor. Q. You heard a sound or did you see this? A. Yes, I did. Q. What did you hear? A. Whoo-Whoo, just like gas or something. Q. Was it like an explosion? A. Yes, it blowed him plum out of his chair, I guess with his help, but it blowed him— Q. Where were you when this was occurring? A. On that bed shocked. . . . Q. Now the cigar was in his left hand, is that right? A. To the best of my knowledge that is the way he reached over to the ash tray to get his cigar with his left hand. Q. And he reached in his right-hand pocket to get his lighter? A. I don't know where he reached to get his lighter at. All I know I heard him kick the top back on his lighter and by the time I turned around I heard woosh, woosh, something like that and he was against the wall standing up trying to put his back out, then you could smell flesh and hair." Elsewhere in his deposition testimony he said that when Foster brought the flame of his lighter to within about eight inches of his face there was an explosion around his head, and his shirt and hair caught fire. He described the flames as extending from Foster's waist to "a foot and a half above his head."

Mr. Kidder, the 17-year-old stepson of Mr. Stafford, described the incident in his testimony thus: "THE COURT: What did he do when he got to the dresser? THE WITNESS: He picked up the lighter and cigar and then sat down. Q. (By Mr. Cavin) Then what did you next observe? A. I was talking to him back and forth and he was talking to me. And I heard him flick the lighter. The next thing I knew, I turned around and, you know, he just went whoosh. Q. Did you see him bring the lighter up toward his face? A. No. I wasn't really looking at him when he brought the lighter up, you know. And then just as I turned, you know, I just seen him go up and just—whoosh, went up. Q. When you say he went up, what—where were the flames? What did you observe? A. Well, his hair just started—it looked like the fire was just moving along through his hair. The next thing I knew, his shoulders and stuff was on fire and his back. Q. How long did this take for it to catch on? A. How long—what do you mean? Q. You said you turned and looked to him when you heard the lighter? A. Yeah. Q. And then the next thing you know, you see him in flames? A. Yes. Maybe a sec-

ond or two and then he went up after he lit the lighter. Q. And so the flames were coming from his shirt and his hair? A. Yeah." Kidder testified that from where he was seated, waiting for plaintiff to finish dressing, he could not see into the bathroom but he could hear appellant spraying his hair. He estimated that the incident occurred about two or three minutes after he had heard the spray.

Approximately one-half hour after the incident, plaintiff took a cab to the Public Service Hospital, where he remained for three weeks.

Plaintiff produced an expert witness, Dr. Franklin J. Agardy, a civil engineer, who testified that the product in question contained alcohol and this component was flammable. He had conducted various tests using the can of The Dry Look that was used by plaintiff on the evening in question. Some of those tests were conducted on the shirt worn by plaintiff at the time of the incident, and others were conducted on other shirts of the same combination of cotton and polyester and upon a human hair wig. In his experiments he sprayed The Dry Look to the cloth material for five or six seconds and then would wait for varying periods of time from ten seconds to two minutes before bringing a lighted match up to the material. On each such occasion the spray would catch fire, but not until the flame was within one-half inch or less of the fabric or wig.

Dr. John Emery, a plastic surgeon, testified that he first examined plaintiff in July 1975, and noticed an area of healed burning 30 centimeters by 18 centimeters over the lower aspect of his back, and another area of scarring measuring 7 by 2 centimeters on the inner aspect of the right upper arm. There was no burning of plaintiff's face, chest, shoulders or neck. The shirt was burned in the lower back area and not around the collar or shoulders.

Appellant concedes that the evidence is sufficient to support the verdict but he seeks to reverse the judgment for claimed errors by the trial court in its instructions to the jury and in the admission of evidence. Appellant pleaded three theories of liability in his complaint: negligence, breach of warranty, and strict liability for the manufacture of a defective product. Before trial, plaintiff withdrew the former two and proceeded to trial solely on the theory of strict liability.

■ Appellant requested the trial court to give this instruction: "Contributory negligence on the part of plaintiff, if any, is not a defense to

an action based on strict liability." His first contention is that the trial court committed reversible error in refusing to give that proposed instruction. The majority opinion in *McGoldrick v. Porter-Cable Tools* (1973) 34 Cal.App.3d 885 [110 Cal.Rptr. 481], cited by appellant, held it to be reversible error for the trial court to refuse an instruction substantially the same as the one quoted above. However, that same court appears to have limited the *McGoldrick* holding to its own facts. In *Endicott v. Nissan Motor Corp.* (1977) 73 Cal.App.3d 917, 930 [141 Cal.Rptr. 95], that court stated: "Plaintiff's claim that the court must instruct the jury that contributory negligence is no defense to a product liability action may be correct when plaintiff's negligence and assumption of risk are pleaded and vigorously argued to the jury [citing its *McGoldrick* opinion], but here no issue was made of plaintiff's negligence." In the case at bench no mention of negligence (contributory or otherwise) was made by either side; and the defense attorney, although he vigorously cross-examined plaintiff and his two friends, Stafford and Kidder, about the circumstances surrounding the incident, offered no evidence of plaintiff's failure to exercise reasonable care for his own safety.[1] The instruction is a correct abstract statement of law, but would not have been a complete statement and would have been confusing to the jury if given. The term "contributory negligence" is a legal term that jurors cannot be expected to understand or to know how to apply without additional instructions defining "negligence" and "ordinary care" (BAJI No. 3.10; see also BAJI Nos. 3.11 and 3.12) and "contributory negligence" (BAJI No. 3.50, first ¶). It is not error to refuse an instruction that does not contain a full and complete statement of the law applicable to the issues raised by the evidence (*Hardin v. Elvitsky* (1965) 232 Cal.App.2d 357, 376 [42 Cal.Rptr. 748]). Further, to instruct on issues, such as contributory negligence, when they are not present in the case is itself reversible error (*Burks v. Blackman* (1959) 52 Cal.2d 715, 719 [344 P.2d 301]; *Brautigam v. Brooks* (1964) 227 Cal.App.2d 547, 555 [38 Cal.Rptr. 784]).

---

[1] In his opening statement and argument to the jury, the defense attorney made brief remarks (not tied into any evidence in the case) to the effect that plaintiff "set himself on fire" and asserting that when one uses the spray on his hair it is only common sense not to touch a match to it. Such argument is not evidence, of course, and the jury was instructed that statements of counsel were not evidence. The defense attorney actually devoted most of his argument developing an explanation of the incident which, devoid of any support in the evidence, nevertheless, sought to place the responsibility for the fire on one of plaintiff's friends who was present at the scene. The extent, if any, to which such an argument could have persuaded the jury on the issue of proximate cause is as conjectural as the argument itself. In no wise, however, could it be construed as a claim that plaintiff's own lack of care was a cause of his injury.

■ Plaintiff also claims that the trial court erred in refusing his proposed instruction No. 26.[2] That proposed instruction was properly refused. It combines into one instruction a variety of general principles gleaned from the texts of different appellate decisions, a form of instruction highly criticized in *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718 [39 Cal.Rptr. 64]. It is confusing, and relates to matters which were adequately and correctly covered in the instructions which were given to the jury. The court gave revised BAJI instruction No. 9.00 (6th ed. 1977), defining a manufacturer's liability for a defective product, and also instructed the jury, in accordance with the use note to that instruction, as to the issues upon which plaintiff had the burden of proof. In other instructions proposed by plaintiff which were given with certain modifications, the jury was instructed as to what constitutes a defect in a product, including the statement that a product is defective if "though faultlessly made, [it] fails to give directions or warnings as to the use of the product in order to prevent it from being *unreasonably*[3] dangerous [italics added]," and then still further instructed on "failure to warn" as a basis for liability. Plaintiff has the right to have the jury instructed upon his theory of the case, and all of the issues presented, but where, as here, the court correctly instructs the jury on each issue covered by the tendered instruction, he cannot complain that it did not adopt his language (*Harris* v. *Belton* (1968) 258 Cal.App.2d 595, 615 [65 Cal.Rptr. 808]; *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists, supra,* 227 Cal.App.2d at p. 719).

The Dry Look used by plaintiff bore the following words on the container: "CAUTION: Flammable. Keep away from fire or flame." Plaintiff

---

[2]"MISUSE OR ABNORMAL USE OF PRODUCT "Under the theory of strict liability, the plaintiff has the burden of proof to show that he was injured while using the product in a way that it was reasonably intended to be used. [¶] Intended use is defined as that use which the seller should have reasonably anticipated. [¶] If under the greater weight of the evidence you find that the defendant's product was being used in an abnormal manner, but which use should have been reasonably anticipated or expected by defendant, then you must determine whether defendant gave an adequate warning against such use. If no adequate warning was given against such abnormal use, and such use was anticipated or expected, and the danger was not apparent to plaintiff, then plaintiff cannot be said to have misused the product."

[3]Plaintiff complains also that the trial court erred in adding the word "unreasonably" to this instruction. The modification made by the court was necessary to correctly state the law (*Dosier* v. *Wilcox-Crittendon Co.* (1975) 45 Cal.App.3d 74, 80 [119 Cal.Rptr. 135]).

testified that he read that warning and was aware that it was flammable, and that he understood the warning to mean "the can and the contents inside the can were explosive, not to store the can near any kind of flame or heat." On appeal he asserts that the warning was legally inadequate because it did not tell plaintiff not to light matches shortly after spraying his hair. The adequacy or inadequacy of the instruction was argued by both sides at length, and the court instructed on the subject. As pointed out above, plaintiff concedes that the evidence is sufficient to support the jury's verdict which impliedly found the warning to be adequate.

Plaintiff's final ground for appeal is that the trial court committed error in permitting the defense to introduce expert testimony. The only witnesses called by the defense were two experts who had conducted tests relating to the flammability of The Dry Look. On January 28, 1976, approximately 13 months before the trial started, defendant served and filed its answers to plaintiff's interrogatories. One of those interrogatories was as follows: "Have any tests been done on THE DRY LOOK since June 26, 1975 to determine its flammability or explosiveness? If the answer...is in the affirmative, please state the following:...." The balance of the interrogatory, among other matters, requested the identity of the person conducting the test, the nature and result of any such test, and whether any written reports of such testing would be made available for inspection by plaintiff's attorney. Defendant's answer follows: "Yes. These tests were performed for the purpose of this litigation and are part of this defendant's work product and are not completed. In the event that it is determined to use the results of said tests at the trial of this case, you will be so advised and the results thereof made discoverable. In any event, disclosure of testing results will be made on a mutual basis." Thereafter plaintiff advised defense counsel of the name of his expert and made such of his test results as had then been completed available to defendant. Plaintiff's expert was deposed by defendant. After his deposition he performed other tests about which he testified, but which were not made known to defense counsel before trial. On the other hand, defendant's first expert, Dr. Eisenberg, was retained on February 24, 1977 (12 days before trial) to conduct tests for the purpose of testifying. He conducted the tests on March 7, one day before trial. That testimony was elicited at the commencement of Dr. Eisenberg's testimony upon plaintiff's voir dire examination. Plaintiff's counsel, outside the presence of the jury, moved to exclude the testimony of the expert on the ground that defense coun-

sel had not advised him of the name of the witness or of the test results. The court, after a full hearing, denied plaintiff's motion. Plaintiff sought no continuance to take the deposition of the witness or to otherwise prepare to meet the expert's testimony. In *Thoren v. Johnston & Washer* (1972) 29 Cal.App.3d 270, 273 [105 Cal.Rptr. 276], cited by plaintiff, the court held that the trial court there had not abused its discretion in granting a defendant's motion to exclude the testimony of a witness whose identity was willfully excluded from an answer to an interrogatory seeking the names of witnesses to an occurrence. In the case at bench, however, we cannot say that the court abused its discretion in denying plaintiff's motion. Section 2019, subdivision (b), of the Code of Civil Procedure, relating to depositions, provides that the trial court "may make any...order which justice requires to protect the party or witness from annoyance, embarrassment or oppression." Section 2030, subdivision (c), of that code extends to the court the same power where discovery is had upon written interrogatories. ■ "To constitute a proper exercise of discretion [in all discovery cases], the factual determination of the trial court should clearly and unequivocally be based upon the following legal concepts:...[¶] 6. The power to prevent abuse which is bestowed on the trial court by the provisions of section 2019, subdivision (b) (1), is the power to exercise discretion based upon the factual showing made. When the record indicates facts on which the court exercised its discretion, that exercise will not be disturbed on appeal; when the facts are undisputed, or there is but one reasonable interpretation thereof, the question ceases to be fact, and is one of law;..." (*Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 383 [15 Cal.Rptr. 90, 364 P.2d 266]). ■ The hearing on plaintiff's motion to strike developed the following facts which were the bases for the trial court's ruling and which preclude our disturbing it: that plaintiff's expert did only minimal testing until just two days before the trial started, and his later testings were not disclosed to defendant's attorney, and thus plaintiff was not in compliance with the claimed agreement; there was no request made by plaintiff in subsequent interrogatories or otherwise for subsequent test results; and when the judge indicated that the remedy sought (total exclusion) was "pretty drastic," plaintiff sought no lesser sanction, nor did he seek a continuance to take the witness' deposition or even to study his notes. Further, defense counsel asserted he had not intended to hide the identity of such witnesses and would have disclosed them and made them available for depositions if plaintiff's counsel had at any time asked for such disclosure. Under all the facts shown by the record, it appears that the trial court's exercise of discretion cannot be disturbed on appeal.

At no place in the briefs does plaintiff point to any part of the defense experts' testimony that caused any prejudice to him. Nevertheless, we have examined the entire testimony of the defense experts and it shows that the testing performed by them was substantially the same as that performed by plaintiff's expert, and with similar results, except that Dr. Eisenberg testified that he could not get the garment that had been sprayed with the product to burn unless he applied a flame directly to the fabric. Under such circumstances, even if the court abused its discretion in denying plaintiff's motion, plaintiff could show no prejudice therefrom.

The judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.